UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

**Jane Doe,**

Plaintiff,

Index No.: 3:26-cv-1397 (ECC/ML)

-against-

EDUCATION PLUS CORPORATION d/b/a FAMILY FOUNDATION SCHOOL; EMMANUEL ARGIROS a/k/a MICHAEL ARGIROS; CINDY ARGIROS a/k/a CINDY RAY a/k/a CINDY RAY ARGIROS; BETTY ARGIROS; KASOS CO FAMILY LP; KASOS ENTERPRISES LLC; CHAPEL HILL LAND HOLDINGS LLC; K9-5 INC.; PAUL GEER; DIANE GEER; LYNDA DRAKE; VILLA VERITAS FOUNDATION INC.; SUZANNE CUSACK; LACKAWANNA COLLEGE; NATIONAL ASSOCIATION OF THERAPEUTIC SCHOOLS AND PROGRAMS; NBT BANK, N.A.; NBT BANCORP INC.; THE HANCOCK HERALD; VILLAGE OF HANCOCK, NEW YORK; HANCOCK VILLAGE POLICE DEPARTMENT; DELAWARE COUNTY SHERIFF'S OFFICE; COUNTY OF DELAWARE, NEW YORK; DELAWARE COUNTY BOARD OF SUPERVISORS; GARNET HEALTH MEDICAL CENTER CATSKILLS-CALICOON; JEFF BRAIN, M.A.; IVAN FRAS, M.D.; SUSAN RUNGE, L.C.S.W.; QUEST FAMILY SERVICES INC.; KAREN WELLS; HEATHER PALMER; JENNIFER WHIPPLE; MICHAEL LOSICCO; ROXY LOSICCO; and NANCY EDWARDS,

Defendants.

---------------------------------------------------------------------X

**VERIFIED COMPLAINT**

*Jury Trial Demanded*

**PRELIMINARY STATEMENT**

1.      For decades, Defendants operated the Family Foundation School ("FFS") disguised to the

public, to parents, to students, and to courts as a therapeutic boarding school for adolescents. In

1

reality, FFS was a racketeering enterprise built to enrich the Argiros family through tuition fraud, forced child labor, and the systematic sexual exploitation of vulnerable minors. The Argiros family and their co-defendants recruited minors from across the United States and Canada, transported them across state lines and international borders, and subjected them to physical coercion, psychological abuse, and sexual exploitation, while complicit local institutions suppressed all reporting and oversight in exchange for the financial and political patronage of the Argiros family.

2.      The tuition payments extracted from families, school districts, and state agencies funded the Argiros family's private estate — the same estate that enrolled minor students were forced to construct, maintain, and farm without compensation under threat of severe physical punishment. The enterprise's financial model was circular and self-reinforcing: fraud brought the children in, forced labor built and sustained the family's wealth, and sexual exploitation was concealed through the same institutional coercion that enforced the labor. This financial model was not confined to the Argiros family. Trial testimony confirmed that affluent members of the Hancock community provided funding for the original construction of the FFS campus. FFS's tuition and payroll revenue, processed for more than two decades through the sole bank branch operating in the Village of Hancock, constituted a disproportionately large share of that branch's commercial account activity in a village of fewer than 1,000 residents. Defendant Emmanuel Argiros individually owns and operates Smith's Colonial Motel and the Upper Delaware Inn within the Village, serves as Treasurer of the Hancock Area Chamber of Commerce, and serves as President of Hancock Partners, Inc., the Village's economic development organization, while Defendant Cindy Argiros owns and publishes The Hancock Herald, the only newspaper serving the Village. In a community of fewer than 1,000 residents, the Argiros family in this way owned

or controlled a substantial concentration of the Village's commerce, its civic and economic-development leadership, and its only local press — and the institutions that should have checked the enterprise, including the only bank, the local and county police, and the medical center, were instead financially dependent upon or beholden to the same family that ran it. This was not just one family profiting — it was a town whose commerce the family largely kept afloat, and which therefore had a financial stake in looking away. Every structural feature of FFS: the isolation of students from their families, the strip searches upon arrival, the sexualized group sessions designed to exploit individual vulnerabilities, the work sanction coercion system, and the deliberate destruction of records, served simultaneously as a predicate act of the racketeering enterprise and as an independent breach of each Defendant's duty of reasonable care to the minor students in their custody. The two theories are not in conflict — they are two sides of the same institutional failure.

3.      Separately and independently, FFS marketed itself to parents, courts, and school districts as a qualified therapeutic institution capable of treating adolescents suffering from drug and alcohol addiction, behavioral issues, depression, and anxiety. Parents paid substantial tuition. School districts allocated public funds. Courts ordered placements. All in reliance on FFS's representations that enrolled students would receive care from licensed psychiatrists, psychologists, and clinical social workers. But FFS employed no qualified treatment professionals. Students who arrived with serious mental health and behavioral conditions received no treatment. They developed new or worsened psychiatric and physical conditions. Plaintiff, a foreign minor brought into the United States and delivered to FFS on Defendants' assurances that they would handle her immigration status, received no genuine treatment, no proper enrollment, and no therapeutic support during her confinement. She entered adulthood

without proper diagnosis or treatment and has sustained years of worsening psychiatric injury, a lasting eating disorder and body-image impairment, a delay of approximately twenty years in her earning capacity, and remains unable to obtain psychiatric care, due to her inability to obtain health insurance. These damages — new and worsened psychiatric conditions, the lasting eating disorder, and long-term educational and vocational impairment — are standalone injuries caused by standalone negligence, governed by their own duties, breaches, and causation. The enterprise's post-enrollment referral pipeline, including Defendant Villa Veritas Foundation Inc., extended this failure to treat by absorbing former FFS students into a treatment framework that did not investigate, disclose, or report the institutional source of their conditions.

4.      Defendant Paul Geer was tried in federal court in February 2025 and sentenced to twenty-seven years in federal prison on September 4th, 2025 for his acts of sexual abuse at FFS and on school trips across state lines, providing direct judicial confirmation of the predicate conduct underlying Plaintiff's claims. The evidence and testimony adduced at those proceedings revealed for the first time the true nature of the enterprise responsible for Plaintiff's abuse — facts Defendants had deliberately concealed for decades — and gave rise to the filing of this action. References to the trial transcript are incorporated throughout this Complaint.

5.      Plaintiff brings this action seeking compensatory damages of not less than $5 million, trebled to not less than $15 million under RICO, together with punitive damages, attorneys' fees, and costs as set forth herein.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) based upon Plaintiff's claims under 18 U.S.C. §§ 1589, 1591, 1594, and 1962 (RICO). This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

7.      This Court has independent jurisdiction pursuant to 18 U.S.C. § 1964(c), which confers federal jurisdiction over civil RICO claims.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because a substantial part of the events and transactions giving rise to Plaintiff's claims occurred within the Northern District of New York. Specifically: (a) the Family Foundation School, the institution at which Plaintiff was confined, abused, and subjected to forced labor and the denial of promised treatment, is located in Hancock, New York, within this District, and the principal conduct giving rise to Plaintiff's claims occurred there; (b) Plaintiff was trafficked and transported at the direction of Defendant Emmanuel Argiros, from Canada, where she was taken without valid travel documents, through Buffalo, New York, from which she was flown to the wilderness program operated by Defendant Quest Family Services Inc. in Monticello, Utah, and thereafter flown back to Buffalo, New York and driven from Buffalo to the FFS campus in Hancock, New York, such that this District was the terminus and intended destination of the trafficking route through which Plaintiff was transported, and  further that Plaintiff's trafficking to Utah itself commenced in Buffalo, New York. Every interstate and international leg of Plaintiff's transport departed from or returned to the State of New York, such that the trafficking both began and ended within New York and jurisdiction in New York is proper on that independent ground; (c) the racketeering enterprise alleged herein was operated through and from FFS and the related Argiros-controlled entities located in and around Hancock, New York,

5

within this District, including the financial institution through which the enterprise's revenues were processed; (d) the United States visa application that FFS prepared and forged in order to retain Plaintiff was created at and in furtherance of Plaintiff's confinement at FFS within this District; and (e) the federal criminal prosecution of Defendant Paul Geer arising from the same enterprise was brought in this District. Venue over the non-resident Defendants, including Defendants Quest Family Services Inc., Karen Wells, Heather Palmer, Jennifer Whipple, and Nancy Edwards, is proper because those Defendants participated in a single trafficking enterprise and conspiracy that reached into and was consummated within this District, because Plaintiff's trafficking commenced in Buffalo, New York and Defendant Quest Family Services Inc. and its principals knowingly dispatched Plaintiff from Utah into New York with advance knowledge of her New York destination, thereby purposefully directing their conduct at the State of New York, and pursuant to the nationwide service-of-process provision of 18 U.S.C. § 1965.

8-A.    This Court has personal jurisdiction over each Defendant. The New York Defendants reside in, are organized under the laws of, or maintain their principal places of business in New York. Defendants Quest Family Services Inc. and Karen Wells purposefully directed their conduct into New York: they took custody of Plaintiff, a minor, for delivery to a New York institution and dispatched her on a flight from Utah to Buffalo, New York with advance knowledge that her destination was the FFS campus in Hancock, New York, and they derived referral fees and reciprocal enrollment revenue from that delivery; Defendant Nancy Edwards solicited and recruited Plaintiff's placement at a New York institution in exchange for fees flowing from that placement. Each thereby transacted business within New York and committed tortious acts causing injury within New York within the meaning of CPLR 302(a), and the exercise of jurisdiction over each comports with due process. Jurisdiction over Defendants

Lackawanna College and the National Association of Therapeutic Schools and Programs is additionally proper under the nationwide service-of-process provision of 18 U.S.C. § 1965, all Defendants having participated in a single enterprise centered in this District.

## THE PARTIES

### Plaintiff

9. Plaintiff proceeds under the pseudonym Jane Doe to protect her privacy given the highly sensitive and personal nature of the allegations set forth herein, including allegations of the sexual exploitation, sexualized mistreatment, and trafficking of a minor, and will move for leave to proceed pseudonymously; Defendants and the Court are aware of Plaintiff's identity.

10. Plaintiff is an adult individual and a citizen of Canada who, as a minor, was recruited in or about 2000 and ultimately confined at FFS beginning in or about February 2001. At the time of her recruitment, Plaintiff was a Canadian minor with a diagnosed history of ADHD and who was experiencing substance-use and behavioral difficulties, including disordered eating, for which her family sought help.

11. Defendant Nancy Edwards, an educational consultant who solicited families for the Argiros/FFS Defendants across the New Jersey, Pennsylvania, and New York region and who advertised on radio broadcasting from Buffalo, New York, recruited Plaintiff's mother and represented that a "wilderness program" operated by Defendant Quest Family Services Inc. and, if necessary, FFS would provide appropriate therapeutic care. Defendant Edwards was paid approximately $3,000 by Plaintiff's family and, upon information and belief, additionally

received referral fees from both Defendant Quest Family Services Inc. and Defendant FFS for placing Plaintiff.

12. Defendants Emmanuel Argiros, Quest Family Services Inc., and Nancy Edwards represented to Plaintiff's mother that, so long as Plaintiff engaged in good behavior and successfully completed the wilderness program, she would not need to attend FFS and would be permitted to return home. On the basis of that representation, Plaintiff's mother understood that Plaintiff was being sent to the United States only for a brief period of a few weeks and would not require a full student visa.

13. That representation was a knowing and material misrepresentation. Defendants had designed the wilderness program and the placement system so that Plaintiff would not successfully complete the program or be returned home, but would instead be deemed to require "aftercare" and funneled from Quest Family Services to FFS. The purported contingency that Plaintiff could avoid FFS by completing the wilderness program was illusory and was made to induce Plaintiff's family to deliver her undocumented into the enterprise for the explicit purpose of extracting payment, sex, and forced labor.

14. Defendants knew that Plaintiff's grandfather had financial means and specifically solicited a three-year tuition commitment. Plaintiff's grandfather provided funds to Plaintiff's mother, who in turn paid FFS by checks transmitted through the mails. Plaintiff was targeted on the basis of that family wealth.

15. When Plaintiff's mother advised Defendants that she could not obtain a visa for Plaintiff in time, Defendant Nancy Edwards directed Plaintiff's mother to Defendant Emmanuel Argiros, and Defendants Emmanuel Argiros and Education Plus Corp. assured her that it did not matter and that they would take care of the immigration paperwork, and instructed her that she could

8

simply bring Plaintiff to the program. Plaintiff's mother, a Canadian National and novice single mother with no experience in immigration matters or in dealings with the United States government, relied on those assurances, having been told that Plaintiff's stay would be brief and that Defendant Argiros would take care of any necessary immigration paperwork should Plaintiff have to stay longer. Consistent with the assurance that Defendants would take care of the immigration paperwork, FFS itself later prepared a visa application for Plaintiff and forged Plaintiff's signature upon it, as alleged below.

16. In reliance on Defendants' assurances, Plaintiff was brought from Canada and, at the direction of Defendant Emmanuel Argiros, departing from Buffalo, New York on or about October 30–31, 2000, flown to the wilderness program operated by Defendant Quest Family Services Inc. in Monticello, Utah, where she was held for approximately seventy-eight days under coercive conditions — including at least one incident within Plaintiff's first ten days in which a male staff member physically restrained her on the ground, sat on her chest, force-fed her, and covered her nose and mouth until she swallowed; an unsupervised overnight "solo" placement in a dry wash during which Plaintiff nearly drowned when it flooded in a rainstorm; and the prolonged denial of properly fitting boots despite Plaintiff's repeated complaints, causing infected blisters, the loss of eight of ten toenails, and lasting injury to her feet — none of which was reported to Plaintiff's mother, and was thereafter flown from Utah to Buffalo, New York and driven from Buffalo to the FFS campus in Hancock, New York, in the Northern District of New York. Defendants had not in fact lawfully regularized Plaintiff's immigration status. Plaintiff's confinement at Quest marked the beginning of the enterprise's conditioning of Plaintiff through fear, isolation, and coercion, priming her to submit to the institutional control that awaited her at FFS; that conditioning was conduct of, and in furtherance of, the joint venture

alleged herein. Defendant Quest Family Services Inc. arranged and effected Plaintiff's onward transport, placing her on the flight from Utah to Buffalo, New York with advance knowledge, coordinated with FFS, that her destination was the FFS campus in Hancock, New York.

17. Plaintiff was one of at least five children funneled from Quest to FFS during Plaintiff's seventy-eight-day placement alone, including one child who was sent from FFS to the wilderness program and back, reflecting an ongoing referral arrangement between the programs for financial gain. The coordinated sequence of Plaintiff's placement : Defendant Edwards' solicitation of Plaintiff's mother in exchange for a fee of approximately $3,000 and her direction of Plaintiff's mother to Defendant Emmanuel Argiros; Argiros' direction of Plaintiff's travel from Buffalo, New York to the Quest program in Utah; Quest's subsequent dispatch of Plaintiff from Utah to Buffalo, New York with advance knowledge that her destination was the FFS campus in Hancock, New York; and FFS's preparation of the forged visa application while Plaintiff remained in Utah and before she had ever arrived at the FFS campus evidences a single coordinated joint venture among Edwards, Quest Family Services, Argiros, and FFS through which Plaintiff was recruited, transported, and retained.

18. Thereafter, while Plaintiff was enrolled at FFS but not yet in its physical custody and remained at the Quest program in Utah, and in order to retain her, FFS prepared a United States visa application for Plaintiff and attempted to have it signed and submitted by forging Plaintiff's signature. The application predates Plaintiff's physical arrival at FFS, as reflected by the date the application bears and by contemporaneous dated photographs of Plaintiff in Utah. The application further reflects an expected stay originally written as four years — for a program FFS marketed as lasting eighteen months — altered to three years, consistent with a design to extract the maximum tuition obtainable before Plaintiff reached the age of majority. Defendants mailed

the application to Plaintiff's mother in Canada with instructions that she sign and submit it; she did not do so, and the document has been recently discovered by Plaintiff throughout the course of the criminal investigation as discussed in further detail below. Through that forged document, Defendants attempted to obtain and maintain control over Plaintiff, a foreign minor, by purporting to regularize her status without her knowledge or her mother's authorization.

19. To conceal Plaintiff's undocumented status and the enterprise's trafficking of a foreign minor from outsiders and authorities, Defendants subjected Plaintiff to coercive efforts to suppress her Canadian national identity, including forbidding her from identifying as Canadian, instructing her not to disclose that she was Canadian, requiring her to surrender belongings such as hockey jerseys and specific winter coats identifying her as Canadian, compelling her on her first morning at FFS to memorize and publicly recite the Pledge of Allegiance, and assigning her daily flag duty under the stated rationale that she needed to learn to be American. When FFS's choir traveled to Toronto in or about 2001, FFS refused to permit Plaintiff — who could not lawfully cross the border — to attend, fabricating disciplinary pretexts for the refusal rather than disclose her undocumented status, and directed Plaintiff's family to pay to stay with Plaintiff for the duration of the trip at cabins that, undisclosed to the family, were owned by the Argiros family. These measures served to prevent the discovery of Plaintiff's undocumented presence and the manner in which she had been brought into and retained within the enterprise.

20. During her confinement at FFS, Plaintiff was subjected to systematic abuse, forced labor, and the denial of promised therapeutic treatment. Plaintiff, who suffered from anorexia and weighed approximately eighty-pounds, was placed in a coerced "food group" run by Defendant Susan Runge in which staff repeatedly placed food before her and compelled her to eat, including stale and moldy food carried over from prior days, forcing her to watch other children eat their own

vomit if they did not comply with demands to finish the food that was given to them (whatever the condition); this conduct inflicted lasting and continuing harm.

21. Furthermore, during her time at FFS, Plaintiff repeatedly sought medical care for severe gynecological pain and bleeding but was told by unlicensed staff members that her conditions were a normal part of a woman's body. When she was finally taken to a gynecologist and prescribed birth control, and truthfully answered a direct question from the male staff member distributing medications as to what the medication was, FFS staff accused her of sexually inappropriate conduct toward staff and placed her on a "blackout" restriction from male students. The denial and delay of appropriate gynecological care, and the retaliatory accusation and restriction that followed when Plaintiff was finally treated, deprived Plaintiff of timely medical care and inflicted further harm.

22. Plaintiff was never properly enrolled in or credited for the schooling FFS represented it would provide. In or about January 2003, when Plaintiff's mother sought to withdraw Plaintiff from FFS, FFS represented to her that withdrawal before the end of the academic year would forfeit the entire year's academic credits — credits FFS knew did not exist, because Plaintiff had never been enrolled, thereby inducing Plaintiff's mother to leave Plaintiff at FFS through June 2003 and extracting approximately *five additional months of tuition*. Upon leaving FFS in or about June 2003, when her mother removed her from the program, and returning to her local high school, she was told that she had no record of any high school credits and would be required to repeat the ninth grade at a local high school at approximately seventeen and one-half years of age and was forced to abandon her education, materially delaying her earning capacity by approximately twenty years. Plaintiff believed that this was simply because American schooling was not transferable to Canadian schooling. In reality, which Plaintiff first discovered during the

12

course of the criminal trial where she learned about the forged visa application, this was consistent with their effort to conceal Plaintiff's undocumented presence, Defendants never formally enrolled Plaintiff and instead recorded the tuition paid on her behalf as a "charitable donation" rather than as payment for an enrolled foreign student, thereby avoiding the records and reporting that a foreign student's enrollment would have generated and further concealing that they had trafficked and were illegally harboring an undocumented minor across state lines.

23. Plaintiff cooperated with the Federal Bureau of Investigation in connection with the federal criminal investigation and prosecution of Defendant Paul Geer, providing documents and identifying witnesses beginning in or about 2021–2022. That investigation concerned Geer's sexual abuse of students; it did not and could not have revealed to Plaintiff the financial structure and fraudulent operation of the enterprise. Plaintiff first discovered the true nature of the racketeering enterprise through which she had been trafficked as a child through the evidence adduced at Geer's February 2025 federal criminal trial and the related public proceedings, including the forged visa application, the recording of her tuition as a charitable donation, and the deliberate destruction of records.

24. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered severe and permanent psychological injury, a lasting eating disorder and body-image impairment, the denial of timely medical and therapeutic care including gynecological symptoms dismissed and left untreated that were later diagnosed as endometriosis and that contributed to multiple miscarriages and, in January 2025, a hysterectomy, a delay of approximately twenty years in her earning capacity, and the continuing inability to obtain psychiatric treatment, which is effectively inaccessible through Ontario's overwhelmed public system, in which psychiatrists are largely unavailable to OHIP patients, and is otherwise available only at out-of-pocket cost or through

13

employment-based health benefits that Plaintiff lacks, and which is further impaired because Defendants' conduct — presented to Plaintiff throughout her adolescence as "treatment" and "help" — instilled in her a lasting fear and distrust of therapeutic settings.

**Defendants**

**25.** Defendant Education Plus Corp., doing business as Family Foundation School (hereinafter "FFS"), is a New York corporation with its principal place of business at 431 Chapel Hill Road, Hancock, New York 13783. FFS was the primary vehicle through which the racketeering enterprise operated, providing the institutional facade, physical campus, staff hierarchy, marketing apparatus, and referral network through which the Argiros family recruited, trafficked, and exploited minor students. FFS misrepresented to parents, courts, school districts, and referring agencies that it provided qualified therapeutic, psychiatric, psychological, and substance abuse treatment services to enrolled students meanwhile it employed no qualified professionals with which to provide such services. At all relevant times, FFS was owned, operated, and controlled by the Argiros Defendants.

**26.** Defendant Emmanuel Argiros a/k/a Michael Argiros is an individual who, at all relevant times, owned, operated, and directed FFS and Education Plus Corp. as president of the board from 1993 through the school's closure in 2014. Defendant Argiros was the principal architect and operator of the racketeering enterprise, made the decision to retain Defendant Geer and other employees despite knowledge of misconduct and propensities, and personally destroyed evidentiary records by shredding. Defendant Argiros chose to recruit Plaintiff to the school and did not provide her with the proper care. Defendant Argiros was directly informed of Defendant Geer's abuse of students at FFS, took no disciplinary action, made no report to law enforcement,

14

retained Geer on staff notwithstanding that knowledge, and instead allowed students who reported abuse to be placed on work sanction — conduct evidencing the enterprise's practice of concealing abuse and retaining staff known to have abused the minor students in its custody. Defendant Argiros currently owns and personally operates KASOS Enterprises LLC d/b/a Smith's Colonial Motel at 23085 State Highway 97, Hancock, New York, operates Upper Delaware Inn at 521 W Main St, Hancock, NY 13783, serves as the President of Hancock Partners, Inc., a community and economic development organization serving the Village of Hancock, owns Kasos Co Family LP which was an owner of the land FFS ultimately sold far below market value, owns K9-5 Inc which developed as part of FFS's efforts to bring its students back to the school using canine searches, and serves as Treasurer of the Hancock Chamber of Commerce.

27. Defendant Cindy Argiros, who publishes and is publicly known under the names "Cindy Ray" and "Cindy Ray Argiros," is an individual who, at all relevant times, served as a family leader, administrator, and operator of FFS and participated directly in the enterprise's operation by conducting and supervising mandatory sexualized table topic sessions, continuing to participate in the enterprise's operations after receiving information requiring intervention, and exercising direct supervisory authority over students during the period of ongoing abuse. Defendant Cindy Argiros is additionally the owner, editor, and publisher of Defendant The Hancock Herald, the only local newspaper serving the Village of Hancock, which she operates under the name "Cindy Ray." Her use of the name "Cindy Ray" rather than "Cindy Argiros" in connection with The Hancock Herald operated to conceal the Argiros family's ownership and control of the only local press outlet serving the community in which the enterprise operated.

**28.** Defendant Betty Argiros co-founded FFS together with her husband and served as Program Director throughout the school's operation. Defendant Betty Argiros was the architect of the enterprise's operational policies, including the table topic disclosure system, the strip search intake procedures, the work sanction coercion apparatus, and the family leadership structure through which student exploitation was organized and sustained. As Program Director, Defendant Betty Argiros set the institutional policies that made the enterprise's predicate acts structurally possible and established the culture of impunity within which abuse was systematically concealed. Defendant Betty Argiros participated in and had supervisory oversight of the daily operation of FFS throughout Plaintiff's enrollment and is directly liable for the enterprise's predicate acts to the extent they were carried out pursuant to the policies she designed and implemented.

**29.** Defendant Paul Geer was, at all relevant times, an employee and agent of FFS serving as a music teacher and chaperone, and a knowing and active participant in the racketeering enterprise who directly committed predicate acts of sex trafficking and forced labor. Geer has been convicted in federal criminal proceedings and sentenced to 27 years in federal prison for sexual abuse committed against students at FFS and during school trips across state lines.

**30.** Defendant Diane Geer was, at all relevant times, a staff member and employee of FFS and the spouse of Defendant Paul Geer. Defendant Diane Geer served in an instructional and supervisory capacity, including supervising study periods for enrolled students including Plaintiff, giving her direct and sustained contact with minor students in their daily educational environment. As school personnel serving in an instructional and supervisory capacity with respect to minor students, Defendant Diane Geer was a mandatory reporter, obligating her to

16

report to the appropriate state child protective authorities any reasonable suspicion that a child in her professional care had been subjected to abuse or maltreatment. Defendant Diane Geer possessed actual or constructive knowledge of her husband's pattern of conduct toward minor students through her sustained presence on the FFS campus, her professional interactions with students in the same institutional environment in which the abuse occurred, and her marital relationship with the primary perpetrator. In addition to her mandatory reporting obligations, Defendant Diane Geer participated directly in the enterprise's coercive control apparatus by supervising and enforcing work sanctions imposed upon enrolled students including Plaintiff — an independent basis for liability that establishes her as an active participant in the forced labor scheme. Defendant Diane Geer received direct financial compensation from the enterprise in the form of wages throughout the period of her employment, and knew or should have known from her sustained presence on campus and her marital relationship with Defendant Paul Geer that the enterprise in which she was employed and from which she financially benefited was engaged in the sexual exploitation and forced labor of the minor students in her professional care. Defendant Diane Geer's failure to report, combined with her active enforcement of the coercive work sanction system, renders her independently liable both as a mandatory reporter and as a participant in and knowing beneficiary of the sex trafficking and forced labor venture.

31. Defendant Lynda Drake was, at all relevant times, an employee and agent of FFS serving as the school nurse and as a self-described licensed Emergency Medical Technician (EMT). Defendant Drake provided nursing and medical services to enrolled students throughout the relevant period. As a nurse and EMT providing direct medical care to minor students presenting with conditions consistent with physical abuse, sexual abuse, and forced labor, Defendant Drake was a mandatory reporter, obligating her to report reasonable suspicion of child abuse or

maltreatment to the appropriate state child protective authorities. Defendant Drake's direct medical contact with the student population placed her in a heightened position of knowledge regarding the physical and psychological condition of the minors in her care, and imposed upon her an independent duty of care that she breached by failing to report, investigate, or intervene. Defendant Drake received direct financial compensation from the enterprise in the form of wages and, through her role as medical provider to the student population, had actual or constructive knowledge of conditions consistent with the ongoing sexual exploitation and forced labor of the minor students in her care. Drake's receipt of compensation from the enterprise while possessing that knowledge and recklessly disregarding it renders her liable both as a mandatory reporter for negligence and as a knowing beneficiary of the sex trafficking and forced labor venture.

**31-A.** Defendants Michael Losicco and Roxy Losicco were, at all relevant times, employees and agents of FFS who together served as the "family leaders" of "Family 2," the family unit to which Plaintiff was assigned, exercising direct daily supervision and control over Plaintiff throughout her confinement. In that role, the Losicco Defendants controlled Plaintiff's access to counseling and to contact with her mother, and Defendant Michael Losicco, in response to her mother's repeated inquiries regarding counseling and withheld telephone contact, represented that counseling would not be provided until Plaintiff cooperated with the program. Defendant Michael Losicco further personally directed and enforced coercive measures against Plaintiff, including ordering her to dig and lie in her own grave, and compelling her to kneel for prolonged periods in forced prayer leaving lasting scarring to her knees while declaring to the students under his control that the program was a dictatorship and that he was its dictator. Upon information and belief, Defendants Michael Losicco and Roxy Losicco received direct financial compensation from the enterprise, and their conduct furthered the enterprise's withholding of the

18

therapeutic services for which tuition had been paid and its concealment of the conditions of Plaintiff's confinement from her family.

**32.** Defendant the Village of Hancock, New York (hereinafter "the Village") is a municipal corporation organized under the laws of the State of New York, located in Delaware County. The Village was a knowing participant in the racketeering enterprise. Trial testimony confirmed that affluent Hancock community members helped fund the original construction of the FFS campus. Defendant Emmanuel Argiros currently owns and operates multiple businesses within the Village, including Smith's Colonial Motel, Upper Delaware Inn, and hospitality businesses actively promoted on the Village's official municipal website. Defendant Argiros currently serves as Treasurer of the Hancock Chamber of Commerce. The Village permitted FFS to operate within its jurisdiction for decades without proper licensure and derived direct economic benefit from the enterprise's operation. FFS further actively promoted Village of Hancock hotels and restaurants directly to the families of enrolled students in its own institutional communications, directing outside revenue into the Village's commercial economy and establishing a direct financial link between FFS's operation and the economic welfare of Village businesses — a link that provided the Village's institutions and leadership additional financial motivation to protect the enterprise from regulatory scrutiny and law enforcement intervention, facilitating it to continue its trafficking scheme undetected. The Village received this economic benefit while knowing or recklessly disregarding, through its law enforcement agency's repeated receipt of abuse reports from FFS students, that the enterprise generating that benefit was engaged in the sexual exploitation and forced labor of minor children, rendering the Village a knowing beneficiary of the sex trafficking and forced labor venture.

**33.** Defendant the Village of Hancock Police Department (hereinafter "Hancock PD") is the law enforcement agency of the Village of Hancock. At all relevant times, Hancock PD officers received direct reports of abuse from FFS students, failed to investigate, suppressed victim complaints, and returned runaway students to FFS without inquiry, all under the financial and political influence of the Argiros family over Village institutions. Hancock PD received direct institutional benefit from the Argiros family's economic patronage of the Village and turned a blind eye to repeated, specific, first-hand reports of abuse by failing to investigate or intervene, thereby enabling the sex trafficking and forced labor venture to continue operating and generating the revenue from which the Village and its institutions derived benefit. Defendant Hancock PD's systematic failure to respond to known abuse reports from multiple students over multiple years constitutes deliberate indifference to ongoing child abuse and knowing participation in the enterprise's suppression of reporting, thereby facilitating the trafficking scheme to continue undetected.

**34.** Defendant Delaware County Sheriff's Office is the law enforcement agency of Delaware County, New York, within whose jurisdiction the FFS campus was located. At all relevant times, Delaware County Sheriff's Office personnel received direct reports of abuse, neglect, and unlawful conditions at FFS from students, parents, and other sources, including reports documented in Delaware County law enforcement records. Defendant Delaware County Sheriff's Office failed to investigate those reports, suppressed victim complaints, returned runaway students to FFS custody without inquiry into the conditions from which they had fled, and failed to enforce the licensing and regulatory requirements applicable to residential institutions operating within Delaware County all under the financial and political influence of the Argiros family, whose economic entrenchment in the county derived directly from the enterprise's

operation. The Delaware County Sheriff's Office received direct institutional benefit from the Argiros family's economic influence over county institutions and turned a blind eye to documented, first-hand reports of abuse by failing to investigate, enforce applicable licensing requirements, or intervene — conduct that enabled the sex trafficking and forced labor venture to continue operating. Defendant Delaware County Sheriff's Office's systematic failure to respond to known abuse reports from multiple students over multiple years constitutes deliberate indifference to ongoing child abuse and knowing participation in the enterprise's suppression of reporting, thereby facilitating the trafficking scheme to continue undetected.

**35.** Defendant Delaware County Board of Supervisors is the governing legislative body of Delaware County, New York. The Delaware County Board of Supervisors exercised oversight authority over county institutions and agencies including the Delaware County Sheriff's Office and held authority over the licensing, regulatory compliance, and institutional oversight of residential programs operating within Delaware County. Delaware County law enforcement records, including records generated in connection with FFS students, confirmed that students as young as fifteen years old were involved in documented incidents at FFS. Despite this institutional knowledge, the Delaware County Board of Supervisors permitted FFS to operate within Delaware County for decades without proper licensure, without fulfilling its oversight obligations with respect to the Delaware County Sheriff's Office's systematic suppression of abuse reports, and without taking any action to require regulatory compliance by an institution whose unlicensed operation was known to county law enforcement. The Board of Supervisors derived financial and political benefit from the Argiros family's economic entrenchment in Delaware County institutions while knowing or recklessly disregarding, through its own law enforcement records, that the enterprise generating that benefit was engaged in the sexual

exploitation and forced labor of minor children, rendering it a knowing beneficiary of the sex trafficking and forced labor venture. Its failure to exercise oversight authority constitutes deliberate indifference to ongoing child abuse and institutional participation in the enterprise's concealment of its true nature from state authorities.

35-A.   Defendant County of Delaware, New York ("the County") is a municipal corporation organized under the laws of the State of New York, within whose borders the FFS campus operated throughout the relevant period. The County acts through its departments, agencies, and officers, including the Delaware County Sheriff's Office and the Delaware County Board of Supervisors, and is the entity liable for the customs, policies, and practices of those bodies alleged herein. The Delaware County Sheriff's Office and the Delaware County Board of Supervisors are named herein as the arms of the County through which the conduct alleged was carried out, and all allegations against them are asserted against the County of Delaware.

**36.** Defendant Garnet Health Medical Center Catskills-Calicoon (hereinafter "Garnet Health") is a healthcare institution that provided medical services to FFS students during the relevant period and received direct financial compensation from FFS, student families, and insurance carriers for those services. At all relevant times, Garnet Health physicians and staff treated FFS students presenting with conditions consistent with physical abuse, sexual assault, forced labor, and untreated psychiatric conditions, failed to fulfill mandatory reporting obligations, and failed to provide or refer students for the psychiatric and psychological treatment their conditions required. Garnet Health received recurring patient referral revenue directly from FFS and its student population and knew or should have known, from the presenting conditions of the minor patients it was treating, that the institution from which those patients were referred was engaged

22

in conduct constituting the sexual exploitation and forced labor of minors. Garnet Health's receipt of that recurring revenue while turning a blind eye to the conditions its own medical staff observed and treated renders it a knowing beneficiary of the sex trafficking and forced labor venture.

37. Defendant Ivan Fras, M.D. was, at all relevant times, held out by FFS as its treating psychiatrist to students, parents, referring agencies, and state authorities. Defendant Fras received direct financial compensation from FFS while providing little to no actual psychiatric services. FFS's misrepresentations that students received weekly psychiatric care — representations Defendant Fras permitted to be made using his name and credentials — were material inducements to parents, courts, and school districts to place and retain students at FFS. Plaintiff presented with identifiable psychiatric and substance abuse conditions requiring professional intervention. Defendant Fras failed to provide or arrange for any meaningful psychiatric evaluation, diagnosis, treatment, or medication management for Plaintiff or other enrolled students despite holding himself out as their treating psychiatrist. Defendant Fras received direct financial compensation from FFS in exchange for lending his professional credentials to the enterprise's fraudulent therapeutic representations, and knew or should have known from the nature and conditions of the students he nominally served that FFS was not providing the therapeutic services it represented. His receipt of that compensation while recklessly disregarding those conditions renders him a knowing beneficiary of the sex trafficking and forced labor venture.

38. Defendant Jeff Brain, M.A. was, at all relevant times, held out by FFS as its consulting psychologist to students, parents, referring agencies, courts, and state authorities. Defendant

23

Brain received direct financial compensation from FFS while providing little to no actual psychological services to enrolled students. FFS's fraudulent representations that students received weekly psychological counseling, representations Defendant Brain permitted to be made using his name and credentials, were material inducements to parents, courts, and school districts to place and retain students at FFS. Defendant Brain failed to provide any meaningful psychological assessment, treatment, or intervention for Plaintiff despite her identifiable need for such services. Defendant Brain received direct financial compensation from FFS in exchange for lending his professional credentials to the enterprise's fraudulent therapeutic representations, and knew or should have known from the nature and conditions of the students he nominally served that FFS was not providing the therapeutic services it represented. His receipt of that compensation while recklessly disregarding those conditions renders him a knowing beneficiary of the sex trafficking and forced labor venture.

**39.** Defendant Susan Runge, L.C.S.W. was, at all relevant times, an employee and agent of FFS serving in a social work capacity and receiving direct financial compensation from FFS. Defendant Runge has admitted in sworn criminal testimony that she began her employment at FFS without the licensure required under New York law and subsequently obtained licensure during her tenure. As the L.C.S.W. specifically designated to provide clinical care to students facing mental health and addiction issues, her unlicensed beginning serves as a count of negligence against FFS itself. Separately, as the designated recipient of all sexual abuse reports within FFS administration, Defendant Runge received no fewer than three such reports and addressed each solely through staff termination without implementing any reporting protocols, staff training, victim services, or therapeutic interventions. Defendant Runge further failed to provide or arrange for any meaningful social work services, therapeutic referrals, or mental

health interventions for enrolled students including Plaintiff despite their identifiable need for such services. Defendant Runge received direct financial compensation from FFS while serving as the designated internal recipient of abuse complaints, meaning she received both financial benefit from the enterprise and direct, first-hand knowledge of the sexual abuse and forced labor occurring within it. Her continued receipt of compensation while taking no action beyond staff termination and making no report to law enforcement or child protective authorities renders her a knowing beneficiary of the sex trafficking and forced labor venture.

40. Defendant Quest Family Services Inc. is a corporation organized under the laws of the State of Utah that operated a residential wilderness program known as "Wilderness Quest," located at 564 North Main Street, Monticello, Utah 84535. Defendant Quest Family Services Inc. operated as a feeder and referral partner within the enterprise: it received minor children, including Plaintiff, subjected them to a coercive wilderness program, and then channeled them to FFS, while FFS in turn referred children to Quest, in a reciprocal arrangement from which both programs derived financial benefit in the form of referral fees and enrollment revenue from student referrals: each program generated paying placements for the other by representing that the other institution was necessary to "fix" the children in its charge, such that students, including Plaintiff, were required to be sent from one institution to the other. The movement of Plaintiff and other children between the two institutions evidences that reciprocal financial benefit. At least five children, including Plaintiff, were transferred from Quest to FFS, including one child who was sent from FFS to the wilderness program and back. Defendant Quest Family Services Inc. participated in the transportation of Plaintiff, a foreign minor without valid travel documents, from Canada through Utah and on to FFS in Hancock, New York, along a route directed by Defendant Emmanuel Argiros, itself dispatching Plaintiff from Utah on a flight to

25

Buffalo, New York with advance knowledge that her destination was the FFS campus in Hancock, New York  and knew or should have known that the institution to which it delivered children was engaged in the sexual exploitation and forced labor of minors. Its participation in and receipt of financial benefit from the referral arrangement renders it a participant in the enterprise and a knowing beneficiary of the sex trafficking and forced labor venture.

41. Defendant Karen Wells was, at all relevant times, an owner, officer, and operator of Defendant Quest Family Services Inc. and directed and controlled its operations, including its referral and transfer arrangement with FFS and its participation in the transportation of Plaintiff. Defendant Wells knew or should have known that children transferred from Quest to FFS were being delivered to an institution engaged in the sexual exploitation and forced labor of minors, and is liable as a participant in the enterprise and a knowing beneficiary of the sex trafficking and forced labor venture.

42. Defendant Heather Palmer, with a business and residential address at 4870 Spanish Valley Drive, Moab, Utah 84532, was, at all relevant times during Plaintiff's confinement at the wilderness program operated by Defendant Quest Family Services Inc. in Monticello, Utah, an employee and counselor of that program, with direct contact with and authority over the minor children in the program, including Plaintiff. Upon information and belief, Defendant Palmer subsequently acquired and took over Quest Family Services Inc. and became its principal, officer, director, and owner. Defendant Palmer contributed to the coercive conditions of the Quest program through which children, including Plaintiff, were prepared for transfer to FFS, and participated in the referral and transfer arrangement through which Quest channeled children to FFS for financial benefit. Defendant Palmer knew or should have known that the institution to which those children were delivered was engaged in the sexual exploitation and forced labor of

minors, and is liable as a participant in the enterprise and a knowing beneficiary of the sex trafficking and forced labor venture.

43. Defendant Jennifer Whipple is, upon information and belief, a principal, officer, director, and owner of Defendant Quest Family Services Inc., with an address at 149 East 300 South, Monticello, Utah 84535. Defendant Whipple participated in the direction and control of Quest Family Services Inc. and its referral and transfer arrangement with FFS, and is liable as a participant in the enterprise and a knowing beneficiary of the sex trafficking and forced labor venture.

44. Defendant Nancy Edwards is an educational consultant who, at all relevant times, solicited and advised families across the New Jersey, Pennsylvania, and New York region, including by means of radio broadcasting from Buffalo, New York, regarding residential placements for their children. Defendant Edwards recruited Plaintiff's mother to place Plaintiff at Quest and FFS, representing that those programs would provide appropriate therapeutic care while concealing their true nature. Defendant Edwards was paid approximately $3,000 by Plaintiff's family and, upon information and belief, additionally received referral fees from both Defendant Quest Family Services Inc. and Defendant FFS for placing Plaintiff, deriving financial benefit from each placement she procured. Defendant Edwards knew or should have known, from the publicly available record of abuse at FFS dating back to at least 1990 — including the formal public cease and desist order issued to FFS by the New York State Division of Alcoholism and Alcohol Abuse in August 1990  and from her position within the residential-placement referral network, that the institutions to which she directed children were engaged in the sexual exploitation and forced labor of minors. Her solicitation of placements and receipt of referral fees while

recklessly disregarding that record render her a participant in the enterprise and a knowing beneficiary of the sex trafficking and forced labor venture.

**45.** Defendant Villa Veritas Foundation Inc. is a New York not-for-profit corporation operating a residential addiction treatment and rehabilitation facility located at 5 Ridgeview Road, Kerhonkson, New York 12446, Ulster County, with additional offices at 6900 Jericho Turnpike, Suite 100W, Syosset, New York 11791, Nassau County. Defendant Villa Veritas Foundation Inc. appeared in FFS's own marketing and referral materials as a recommended post-enrollment treatment provider, establishing Villa Veritas as a knowing participant in the enterprise's referral network and a beneficiary of FFS's tuition fraud and trafficking scheme. Through that referral relationship, Villa Veritas Foundation received financial benefit from the FFS pipeline by absorbing former FFS students — students whose untreated mental health and addiction conditions made them dependent on continued residential treatment — into a treatment framework that did not investigate, disclose, or report the institutional source of their conditions, thereby advancing the enterprise's concealment of its true nature. Villa Veritas Foundation knew or should have known, from its inclusion in FFS's own marketing materials and from the presenting conditions of the former FFS students it received, that the referral network through which it received patients and financial benefit was associated with a sex trafficking and forced labor venture, rendering it a knowing beneficiary of that venture.

**46.** Defendant Suzanne Cusack was, at all relevant times, an agent, employee, officer, or director of Villa Veritas Foundation Inc. who participated in the operation and oversight of Villa Veritas Foundation's role as a recommended post-enrollment treatment provider within the FFS referral network. Defendant Cusack is liable as a knowing beneficiary of the sex trafficking and forced

labor venture, having participated in and derived financial benefit from the referral relationship through which Villa Veritas Foundation received former FFS students whose untreated conditions made them dependent on continued residential treatment, while failing to investigate, disclose, or report the institutional source of those students' conditions, thereby advancing the enterprise's concealment of its own existence. Defendant Cusack knew or should have known, from Villa Veritas Foundation's inclusion in FFS's own marketing materials and from the presenting conditions of the former FFS students it received, that the referral network from which she and Villa Veritas Foundation derived financial benefit was associated with a sex trafficking and forced labor venture.

**47.** Defendant Lackawanna College is a Pennsylvania institution of higher education with its principal place of business at 501 Jefferson Avenue, Scranton, Pennsylvania. Lackawanna College participated directly in the FFS enterprise by placing professors and instructors on the FFS campus in Hancock, New York to provide Advanced Placement and college-level courses to enrolled students as part of FFS's academic program. Lackawanna College's instructors were physically present on the FFS campus on a regular basis during Plaintiff's enrollment, giving Lackawanna College actual or constructive institutional knowledge of the conditions under which students were held, the coercive environment in which its courses were delivered, the absence of any legitimate therapeutic or educational infrastructure, and the pattern of abuse and exploitation that pervaded the institution. Lackawanna College received direct financial compensation from FFS for the educational services its instructors provided and derived direct reputational and enrollment benefit from the association with FFS's marketed academic program. Lackawanna College knowingly advanced the enterprise by lending academic credibility to FFS's marketing representations — representations used to induce parents, courts, and school

districts to place and retain students including Plaintiff at FFS, while its physically present instructors provided the institutional cover of a credentialed academic program to what was in reality a racketeering enterprise. Lackawanna College received this financial compensation and reputational benefit while its own instructors were physically present in the environment where the exploitation was occurring and knew or should have known from those direct observations that FFS was engaged in the sexual exploitation and forced labor of its students. Lackawanna College's failure to report the conditions its instructors directly observed, combined with its continued receipt of compensation, renders it a knowing beneficiary of the sex trafficking and forced labor venture.

**48.** Defendant National Association of Therapeutic Schools and Programs ("NATSAP") is a national membership and accreditation organization for therapeutic boarding schools and residential treatment programs, including FFS, which was a founding member of NATSAP. NATSAP accepted FFS as a founding member, lent FFS the institutional legitimacy of its membership designation, and published and promoted FFS's membership in its directories and marketing materials, which were used by parents, courts, and referring agencies and consultants as evidence that FFS met recognized standards for therapeutic residential programs. NATSAP received membership dues from FFS and derived organizational benefit from FFS's founding membership status. NATSAP knew or should have known, through its membership oversight responsibilities and its industry-wide knowledge of conditions at NATSAP member institutions, that FFS operated without the licenses, credentials, and professional staff its membership status implied it possessed. NATSAP's continued receipt of membership dues and promotion of FFS's membership designation despite this knowledge thereby actively generating the institutional legitimacy that induced referring agencies to place students including Plaintiff at FFS renders it a

knowing beneficiary of the sex trafficking and forced labor venture. NATSAP's continued acceptance of FFS's membership dues and promotion of FFS's membership designation despite this knowledge constitutes knowing advancement of and financial participation in the enterprise's fraudulent misrepresentation scheme.

49. Defendant NBT Bank, N.A. is a federally chartered national bank with a full-service branch located at 11 East Main Street, Hancock, New York 13783,  the same village in which FFS operated its campus and through which the enterprise described herein conducted its financial affairs. NBT Bank has maintained a continuous banking presence in the Village of Hancock since 1907, a period of more than 115 years encompassing the entirety of FFS's operational life from its founding through its closure in 2014. Defendant NBT Bancorp Inc. is the publicly traded parent company of NBT Bank, N.A., incorporated in the State of Delaware with its principal executive offices at 52 South Broad Street, Norwich, New York 13815, registered with the United States Securities and Exchange Commission under Commission File Number 000-14703, and listed on the NASDAQ Stock Market under the ticker symbol NBTB. NBT Bancorp Inc. reports total assets of approximately $16.2 billion, total stockholders' equity of approximately $1.91 billion, and a market capitalization of approximately $2.49 billion, and is named as a defendant in its capacity as the controlling parent entity of NBT Bank, N.A. At all relevant times, NBT Bank, N.A. held one or more accounts in the name of Education Plus Corporation d/b/a Family Foundation School and in the individual names of Emmanuel Argiros, Cindy Argiros, and Betty Argiros, through which the tuition payments, payroll disbursements, and other financial proceeds of the racketeering enterprise described herein were deposited, processed, and disbursed. As the sole bank operating in the Village of Hancock throughout the relevant period, NBT Bank received substantial financial benefit from its account relationship with the enterprise

including account fees, processing fees, and float income on deposit balances representing several million dollars in aggregate tuition revenue and knew or should have known from the scale of that revenue, the corporate purpose stated in FFS's own account-opening documents, and the publicly available record of FFS's unlicensed and abusive operation, that the enterprise from which it was receiving that benefit was engaged in the sexual exploitation and forced labor of the minor students in its clients' custody. NBT Bank turned a blind eye to those facts by utterly failing to investigate, report, or terminate the account relationship, rendering it a knowing beneficiary of the sex trafficking and forced labor venture.

50. Defendant Kasos Co Family LP is a New York limited partnership owned and controlled by the Argiros Defendants that, at relevant times, held title to the FFS real property and operated as an alter ego of the Argiros Defendants and the enterprise. Title to the FFS campus was transferred into Kasos Co Family LP by the Argiros Defendants at a time when Defendant Emmanuel Argiros and the other Argiros Defendants possessed actual knowledge of pending and anticipated civil claims arising from the conduct alleged herein, including prior civil litigation in which FFS had been named as a defendant. Kasos Co Family LP thereafter, in November 2014, transferred the primary FFS campus at 110 Chapel Hill Road, Hancock, New York to Defendant Chapel Hill Land Holdings LLC for stated consideration of $2,099,000 — a figure below the total assessed market value of the transferred parcels. This two-step transaction, transferring title into a family-controlled limited partnership, and then out to a separate limited liability company was structured to place the enterprise's primary real property asset beyond the reach of civil creditors and constitutes a fraudulent transfer under applicable law. Because Kasos Co Family LP is wholly owned and controlled by the same individuals who owned, operated, and directed the enterprise, its participation in this transfer was not independent or arm's-length but was a

32

deliberate act in furtherance of the enterprise's concealment of assets from Plaintiff and other victims.

51. Defendant Kasos Enterprises LLC is a New York limited liability company owned and controlled by the Argiros Defendants. Kasos Enterprises LLC owns the land on which the Upper Delaware Inn is situated, among other significant real property holdings in the Village of Hancock and surrounding area. Kasos Enterprises LLC is an alter ego of the Argiros Defendants and of the other Kasos entities, sharing common ownership, common management, and common purpose. Through Kasos Enterprises LLC and the broader network of Kasos entities — including Kasos Co Family LP, Kasos Associates, and Kasos Inc. — the Argiros Defendants have maintained and continue to maintain pervasive financial influence over the Village of Hancock, its commercial institutions, and its civic organizations, including through Defendant Emmanuel Argiros's role as Treasurer of the Hancock Area Chamber of Commerce and President of Hancock Partners, a non-profit that funds community projects in Hancock. This continued financial entrenchment in Village institutions is directly relevant to the Village of Hancock's motivation to protect the enterprise from law enforcement scrutiny as alleged herein.

52. Defendant Chapel Hill Land Holdings LLC is a New York limited liability company that acquired the FFS real property from Kasos Co Family LP in November 2014 and an additional parcel from Defendant Emmanuel Argiros in June 2016. Chapel Hill Land Holdings LLC took title with actual or constructive notice of the civil and criminal claims against the transferors, including notice arising from the presence and concealment of evidentiary records in a shed on the transferred property that were subsequently recovered by the FBI as revealed during the 2025 criminal trial.

33

**53.** Defendant K9-5 Inc. is a New York corporation whose corporate address remains the FFS campus grounds in Hancock, New York. Throughout the period of Plaintiff's enrollment and before K9-5 Inc. was ever formed, the Argiros Defendants kept working dogs on the FFS property and used those dogs to track, pursue, and forcibly return students who attempted to escape the institution, ensuring that the minor students confined at FFS could not flee the forced labor and sexual exploitation to which they were subjected. The dogs were thus an instrument of the enterprise's coercive control apparatus from the outset, operating on the same school grounds where the abuse occurred. The Argiros Defendants subsequently formalized this canine operation into the corporate entity now known as K9-5 Inc., which was capitalized with and developed out of the financial proceeds of the trafficking and forced labor enterprise and which continued to train and deploy dogs on the FFS campus. K9-5 Inc. therefore both provided the coercive infrastructure that physically prevented students from escaping the enterprise and was itself a financial beneficiary of the enterprise, having been created through and sustained by the enterprise's unlawful proceeds. K9-5 Inc. is an alter ego of the Argiros Defendants and the enterprise, knew or should have known that the enterprise from which it was created and on whose grounds it operated was engaged in the sex trafficking and forced labor of minor students, and its assets traceable to the proceeds of that enterprise are reachable through the judgments sought herein.

**54.** Defendant The Hancock Herald is the only local newspaper serving the Village of Hancock, with its principal place of business at 102 East Front Street, Hancock, New York 13783. It is owned, edited, and published by Defendant Cindy Argiros, a principal of the enterprise, who operates it under the name "Cindy Ray" — a use of her maiden or alternate name that served to conceal the Argiros family's ownership of the Village's only newspaper from the public. The

Hancock  is not an independent press outlet but a business owned and controlled by the same family that owned and operated FFS, and it was financially intertwined with the enterprise: Argiros-owned businesses, including Smith's Colonial Motel and the Upper Delaware Inn, paid for advertising in its pages, and it derived revenue from those Argiros-affiliated businesses throughout the relevant period. The Hancock Herald published promotional content concerning FFS that furthered the enterprise's fraudulent marketing of the school to the families of prospective students, and it did not report the abuse, regulatory actions, or law enforcement complaints concerning FFS that were matters of public concern in the community it served. Through its ownership and control of the only local newspaper, the Argiros family ensured that the enterprise's conduct would not be exposed in the one press outlet positioned to bring it to the attention of Village residents, the Village, Hancock PD, and the Delaware County Sheriff's Office. The Hancock Herald knowingly received financial benefit from its relationship with the enterprise and its principals, knew or should have known that the enterprise was engaged in the sex trafficking and forced labor of minor students, and is a knowing beneficiary of the sex trafficking and forced labor venture and a participant in the enterprise's scheme to fraudulently misrepresent FFS to the public.

## FACTUAL ALLEGATIONS

### A. The FFS Enterprise: Structure and Purpose

55.    The FFS racketeering enterprise was an association-in-fact that operated through the FFS institution as its primary vehicle but extended beyond FFS to encompass a network of complicit local institutions, professional enablers, and referring agencies. The enterprise was structurally

35

distinct from any individual defendant and existed as an ongoing organization with its own staff hierarchy, marketing apparatus, referral network, physical campus, and financial infrastructure that persisted independently of any particular predicate act committed by any individual defendant.

56.    FFS marketed itself to the public, parents, courts, and referring school districts as a therapeutic boarding school offering weekly psychological and psychiatric services, drug and alcohol rehabilitation, therapeutic counseling grounded in the principles of Alcoholics Anonymous, and a rigorous academic program. In reality, FFS was founded and operated by former alcoholics and self-identified sex addicts with no professional licensing, clinical training, or educational credentials relevant to the treatment of adolescent substance abuse, mental health disorders, or learning disabilities. FFS operated without a single license, certification, or trained professional required to deliver the therapeutic services it represented to parents, courts, and state authorities that it provided. FFS's unlicensed status was, moreover, a matter of formal public record from the enterprise's earliest years: in 1990, the New York State Division of Alcoholism and Alcohol Abuse notified FFS that it was operating without the license required by New York law and, in August 1990, issued FFS a formal, public cease and desist order. FFS nonetheless continued to operate, and that order remained a publicly available state enforcement record throughout the ensuing decades, including at the time of Plaintiff's recruitment and confinement. This fundamental and pervasive misrepresentation to the public was the foundation of the enterprise.

57.    The enterprise operated for three interlocking purposes: (a) extracting substantial tuition payments from the families of enrolled students, public school districts, and state agencies through misrepresentations about the nature and quality of services provided; (b) obtaining free

child labor from enrolled students to construct and maintain the Argiros family's private estate and livestock operation, the construction and maintenance of which generated direct economic activity within the Village of Hancock, enriched the Argiros family's real property holdings within the Village, and increased the Argiros family's financial and political influence over Village institutions; and separately (c) grooming and sexually exploiting enrolled students while maintaining through institutional coercion and external suppression the silence necessary to conceal the enterprise's true nature.

58.    FFS recruited students by deliberately pathologizing normal adolescent behaviors, most of which could have been remedied through the proper adolescent treatment during crucial developmental years which FFS purported to offer — including occasional alcohol or marijuana use, minor disciplinary issues, mental health issues, eating disorders, and family conflict — to convince parents, courts, and school districts that FFS's intervention was necessary. FFS enrolled children as young as twelve years old, creating a combined seventh- and eighth-grade class to accommodate children too young for high school coursework. FFS used its academic record, sports programs, and music and choir department as marketing tools, and its membership in the National Association of Therapeutic Schools and Programs (NATSAP) as a legitimacy shield. FFS and its agents induced parents and guardians to sign over legal guardianship rights to the Argiros family.

## A.1. The Argiros Family's Economic Domination of the Village of Hancock

59.    The Village of Hancock is a small rural community in Delaware County, New York, with a population of fewer than 1,000 residents. Within a community of that size, the Argiros family owned, operated, or controlled a substantial concentration of the businesses and civic institutions

that made up the Village's commercial life, and, upon information and belief, ranked among the largest private commercial actors and employers in the Village. The family's economic footprint spanned lodging, hospitality, local media, economic development, and real property, and was anchored by FFS itself, which for more than two decades was among the largest economic engines operating within the Village.

60.    Defendant Emmanuel Argiros owned and operated Smith's Colonial Motel and the Upper Delaware Inn, lodging and hospitality businesses serving the Village and the visitors drawn to the Upper Delaware region. Defendant Cindy Argiros owned, edited, and published The Hancock Herald, the only newspaper serving the Village, giving the family control of the sole organ of local news. Defendant Emmanuel Argiros served as Treasurer of the Hancock Area Chamber of Commerce and as President of Hancock Partners, Inc., the Village's economic-development organization — positions that placed the family at the center of the Village's commercial governance and gave it formal authority over the promotion and direction of local economic activity. Through Kasos Co Family LP, Kasos Enterprises LLC, and Chapel Hill Land Holdings LLC, the family held significant commercial and residential real property within and around the Village.

61.    FFS was itself a dominant economic presence. It enrolled a student body paying tuition of up to approximately $40,000 per year, employed local staff, and routed its tuition revenue and payroll through the sole NBT Bank branch in the Village, where, upon information and belief, that revenue constituted a disproportionately large share of the branch's commercial account activity in a village of fewer than 1,000 people. Trial testimony confirmed that affluent members of the Hancock community had funded the original construction of the FFS campus, establishing the community's financial investment in the enterprise from its inception. FFS further directed

38

outside revenue into the Village's economy by promoting Village lodging and restaurants, including the Argiros family's own establishments, to the families of enrolled students.

62.    The consequence of this economic concentration was that the institutions whose independent oversight should have detected and halted the enterprise were instead financially dependent upon, beholden to, or controlled by the same family that operated it. The only bank in the Village profited from the enterprise's deposits; the only newspaper was owned by the family and suppressed adverse coverage; the Chamber of Commerce and the Village's economic-development organization were led by the enterprise's principal; and the local and county law-enforcement and governmental bodies derived the benefit of the family's economic patronage of a community that depended upon it. In a village this small, no independent local institution was positioned to act against the family without acting against the economic interests of the Village itself. This structural economic dependence is what allowed the enterprise to operate openly for decades: the smallness of the community, combined with the family's domination of its commerce, turned the very institutions that should have checked the enterprise into beneficiaries of its continuation.

**B. Negligent Operation of a Purported Therapeutic Institution and Fraudulent Misrepresentation of Therapeutic Capabilities**

63.    Plaintiff was referred to FFS for the express purpose of receiving psychiatric, psychological, behavioral, and educational support for alcohol abuse, disordered eating, and ADHD. Defendants represented to Plaintiff's family and to the educational consultant who placed Plaintiff that FFS was equipped to provide such services through qualified licensed professionals including a consulting psychiatrist, a consulting psychologist, and licensed social

workers. This representation was the predicate and the price: Plaintiff's grandfather paid substantial tuition in direct and reasonable reliance on Defendants' promise of qualified professional treatment.

64.    These representations were false in every material respect. FFS employed no licensed psychiatrist providing regular clinical services to students. FFS employed no licensed psychologist providing regular therapeutic services to students. The individuals whose names and credentials were used to support these representations — Defendants Fras, Brain, and Runge provided little to no actual clinical services to enrolled students. Plaintiff never received a psychiatric evaluation, diagnosis, or treatment plan from Fras. Plaintiff never received individualized psychological counseling from Brain or Runge. Plaintiff never received evidence-based substance abuse treatment or behavioral intervention from any professional. The only purported treatment modality actually administered was a coerced, quasi-religious twelve-step program run by unlicensed staff and by fellow students, in which Plaintiff's progression — and with it her prospect of release — was expressly conditioned on professed religious acceptance, and in which Plaintiff was punished and publicly shamed for her lack of religious belief.

65.    Plaintiff presented to FFS with conditions that FFS itself publicly identified as requiring professional intervention, including behavioral and substance-related concerns. These conditions went undiagnosed, untreated, and unaddressed throughout Plaintiff's enrollment at FFS.

66.    As a direct result of Defendants' negligent failure to provide the therapeutic treatment they represented would be provided, Plaintiff was deprived of the opportunity to receive timely diagnosis, treatment, counseling, medication management, and trauma intervention that would have mitigated the psychological and physical injuries she has sustained and continues to sustain. Had Plaintiff received competent psychiatric and psychological treatment during her enrollment

at FFS, a critical time during adolescent development, the trajectory of her mental health, her education, and her personal relationships would have been materially different. These claims are pleaded simultaneously with, and without prejudice to, all other theories of liability set forth in this Complaint and arise independently from, and do not require proof of, any other theory of liability alleged herein.

67.    The psychological deterioration Plaintiff has suffered, including severe and persistent psychiatric injury, a lasting eating disorder and body-image impairment, the denial of timely medical and therapeutic care, and the impairment of her earning capacity was caused independently and separately by Defendants' **negligent failure** to provide the therapeutic services they promised.

68.    Defendants Fras, Brain, and Runge independently and directly breached their professional duties to Plaintiff by lending their names and credentials to FFS's misrepresentations while providing little to no actual clinical services, failing to conduct any meaningful assessment of Plaintiff's therapeutic needs, and failing to provide or arrange for any evidence-based treatment intervention during Plaintiff's enrollment.

## C. Linda Drake's Dual Role and Mandatory Reporting Failure

69.    Defendant Linda Drake occupied a privileged position of access to the FFS student population throughout the relevant period. As the school nurse and self-described licensed EMT, Drake examined and treated enrolled students for physical conditions and injuries during the period in which the abuse described herein was actively occurring, giving her direct medical

contact with students presenting with conditions consistent with physical abuse, sexual abuse, and forced labor. That contact placed Drake in a position of trust and access with respect to the minors in her care, imposed upon her heightened duties of care, and gave her actual or constructive knowledge of conditions requiring mandatory reporting. Drake's failure to fulfill those obligations constitutes an affirmative breach of duty that enabled the abuse to continue. Defendant Drake further personally engaged in physical abuse of Plaintiff: during a family visit, Drake seized Plaintiff by the hood of her jacket and threw her to the ground in the presence of Plaintiff's mother, grandmother, and cousin as Plaintiff attempted to greet them, on the stated rationale that Plaintiff was attempting to run away.

### D. Forced Labor and Institutional Exploitation

70.    FFS employed a punishment system known as "work sanctions" that served the dual purpose of extracting unpaid physical labor from minor students for the direct financial benefit of the Argiros family and maintaining compliance with all demands of the enterprise through a pervasive climate of fear and physical coercion.

71.    Work sanction labor performed by minor students for the direct financial benefit of the Argiros family included, without limitation: digging excavation trenches on the Argiros family estate using only a tablespoon; shoveling snow to maintain the Argiros family estate during wintertime; cleaning waste from the Argiros family's pig pens and farm animal enclosures; performing construction labor on the Argiros family's private residence; assisting in the construction of the Argiros family chapel; moving rocks and bricks across the Argiros family grounds; preparing meals for the Argiros family, staff, and student body; planting seed and gardening to provide food for the Argiros family, staff, and student body to ensure that the

42

Argiros family did not have to pay for groceries, cleaning and maintaining the Argiros family home; mowing, with push mowers, the extensive fields and grounds surrounding the campus; producing the enterprise's own marketing and promotional materials — including newsletters, yearbooks, promotional videos, and photography — through its purported journalism program; and sewing and tailoring gowns and costumes for the school's revenue-generating chorus and performance programs. This labor was performed exclusively by minor students, without compensation, and without the consent of students or their parents or guardians.

72.    To compel compliance with work sanctions and all other demands of the enterprise, FFS employed physical and psychological coercion including: confinement in locked closets for multiple days without food, water, or sanitary facilities; encasing students in rolled rugs bound tightly with duct tape for days at a time, during which students were forced to defecate and urinate on themselves while a fellow minor student supervised; forcing students to consume their own vomit; forcing students, including Plaintiff, to dig and lay in their own graves; compelling students, including Plaintiff, to preface every utterance with a scripted self-denunciation identifying herself as an addict, an alcoholic, and a liar whose word should never be believed, while restricting her permitted response to anything said to her to the words "yes, thank you"; requiring Plaintiff to sleep on the floor of an unused room, and for a period of months in a closet, on the stated ground that she did not deserve a bed; denying Plaintiff shoes in all seasons and requiring her to wait outdoors in winter with wet hair; requiring students to wear or carry signs bearing degrading statements; compelled religious observance enforced by punishment; and direct physical assault by staff members. These methods were institutionalized practices implemented systematically and known to enterprise leadership.

73.     The work sanction system and the sexual abuse scheme operated as integrated instruments of control. The deliberate presence of a fellow student as a witness during work sanctions was a calculated mechanism to ensure that the threat of punishment was sufficient to maintain compliance with all demands of the enterprise, including sexual demands. Multiple witnesses at Geer's federal criminal trial testified that students understood that failure to comply meant, in the words of one witness, would mean that they would "pretty much die here." Trial testimony further confirmed that FFS charged parents $150 per night for isolation sanctions, establishing physical coercion as an independent revenue-generating element of the enterprise. Those isolation sessions were supervised not by paid staff but by other minor students performing compelled, uncompensated labor, such that the per-night isolation charges billed to parents were themselves fraudulent. Trial testimony confirmed that work sanctions were ordered and enforced by family leaders, including Defendant Geer and Defendant Diane Geer. Senior students were themselves compelled, as a condition of advancement and eventual release, to monitor and enforce sanctions against other students, conscripting the children in the enterprise's custody into its own coercive apparatus.

74.     Plaintiff was personally subjected to multiple instances of work sanctions, including being compelled to care for and maintain Defendants' livestock and farm animals and to dig the entirety of the Argiros family garden which has now been replaced by an Olympic swimming pool on its current grounds, plant its seeds, and harvest the fruits for groceries. Plaintiff was further forced, at the direction of Defendant Michael Losicco, to dig and lie in her own grave as a punitive act of intimidation and degradation staged to show Plaintiff how, in Defendants' telling, she would inevitably end up. The scar of that excavation remained visible on the grounds when Plaintiff visited the site in or about 2025.

44

**E. Sexual Abuse and Trafficking of Plaintiff**

75.    Beginning on or about October 31, 2000, and continuing into 2001, Plaintiff, then a Canadian minor, was brought from Canada through Buffalo, New York and, at the direction of Defendant Emmanuel Argiros, flown from Buffalo to the wilderness program operated by Defendant Quest Family Services Inc. in Monticello, Utah, and thereafter flown back to Buffalo, New York and driven from Buffalo to the FFS campus in Hancock, New York. Defendant Quest Family Services Inc. itself dispatched Plaintiff from Utah on the flight to Buffalo, New York, with advance knowledge that her destination was the FFS campus in Hancock, New York, thereby knowingly transporting Plaintiff in interstate commerce in furtherance of the venture. Defendant Nancy Edwards directed Plaintiff's mother to Defendant Emmanuel Argiros, and Defendants Emmanuel Argiros and Education Plus Corp. had assured Plaintiff's mother that they would handle Plaintiff's immigration paperwork and that she could simply bring Plaintiff to the program; Plaintiff's mother relied on those assurances in permitting Plaintiff to be brought to the United States. Plaintiff was one of at least five children moved from Quest to FFS pursuant to a reciprocal referral arrangement between the programs.

76.    While Plaintiff was enrolled at FFS but not yet in its physical custody, and while she remained at the Quest program in Utah, and in order to retain her, FFS prepared a United States visa application for Plaintiff and attempted to have it signed and submitted. The signature appearing on the application is Plaintiff's own signature, which FFS forged. Through that forged document, Defendants attempted to exercise and maintain control over Plaintiff, a foreign minor, without her knowledge or her mother's authorization. Defendant Nancy Edwards, upon information and belief, received referral fees from both Quest and FFS for procuring the

45

placement, and Plaintiff's tuition was funded by Plaintiff's grandfather and paid to FFS. Each such mailing and financial transmission in furtherance of the scheme constitutes a discrete predicate act of mail or wire fraud.

77.    As part of the enterprise's operation, Plaintiff was subjected to a sexualized institutional regime. In mandatory group "table topic" sessions conducted before staff, Plaintiff was called a "whore" and compelled to disclose detailed intimate sexual matters; on at least one occasion the seating was arranged so that Plaintiff, a minor, was positioned in close proximity to a staff member who was visibly sexually aroused during such a session, exposing her to that staff member's sexual conduct without her consent. The foregoing conduct subjected her, as a minor in Defendants' custody, to sexualized degradation and exposure as a feature of the venture's operation. This sexualized regime was a feature of the venture into which Plaintiff was trafficked and through which the enterprise sexually exploited the minor students in its custody.

78.    Throughout her confinement, Plaintiff came under the direct supervision and control of FFS staff and the Argiros Defendants, who used the institution's total control over the minor students, including the work sanction system, isolation, and the threat of retaliation for reporting to compel compliance and to suppress disclosure of the conditions within the enterprise. Defendants further engaged in a calculated campaign of preemptive discrediting, representing to parents, police, hospitals, and the surrounding community that FFS students were liars, manipulators, and addicts whose accounts should not be believed ensuring in advance that any eventual disclosure by a student would be dismissed, and prolonging the concealment of the enterprise's conduct for decades after students departed.

79.    Plaintiff was subjected to forced, uncompensated labor for the benefit of the Argiros family, and to a coercive "food group" run by Defendant Susan Runge. Plaintiff suffered from

anorexia and weighed approximately eighty-pounds, staff repeatedly placed food before her and compelled her to eat, including stale and moldy food carried over from prior days, forced her to watch other students eat their own vomit to instill fear in her that if she did not finish her food (regardless of the condition) that she could be subjected to the same form of punishment, and forced her to dig and lay in her own grave as a punitive act of intimidation and degradation, inflicting lasting eating-disorder and body-image harm. The enterprise exploited the minor students in its custody, including Plaintiff, through this coercive apparatus while concealing its conduct from families, regulators, and authorities.

80.     The enterprise relied on its total institutional control over the minor students in its custody: the work sanction system, isolation from outside contact, the suppression of Plaintiff's national identity, and retaliation against students who complained to compel compliance, to exploit those students, and to ensure their silence, thereby furthering the concealment of the conduct occurring within the venture. When prospective parents toured the campus, students were placed on notice in advance, punishments were visibly relaxed for the duration of the visit, and students under work sanction were directed to work where they would not be seen, so that the conditions actually prevailing at FFS were concealed from the very families being solicited.

81.     Plaintiff repeatedly sought medical care for severe gynecological pain and was told it was a normal part of a woman's body. When Plaintiff was finally taken to a gynecologist and prescribed birth control, and truthfully answered a direct question from the male staff member distributing medications as to what the medication was, FFS staff accused her of sexually inappropriate conduct toward staff and placed her on a "blackout" restriction from male students. Plaintiff was also subjected to coercive suppression of her Canadian national identity, including

being forbidden from identifying as Canadian and assigned daily flag duty under the stated rationale that she needed to learn to be American.

82.    Plaintiff was never properly enrolled in or credited for the schooling FFS represented it would provide. Upon returning to her local high school, Plaintiff was informed by a guidance counselor that no credits had transferred and that she would be required to repeat the ninth grade at approximately seventeen and one-half years of age; Plaintiff withdrew from school in that same meeting and later obtained a GED, delaying her earning capacity by approximately twenty years. A fellow student assigned to work in the FFS business office, who observed at the time that Plaintiff's tuition had been recorded as a charitable donation and that Plaintiff was never formally enrolled, a fact discovered by Plaintiff during the 2024 criminal investigation period as referenced in further detail herein.

83.    When Plaintiff and other students attempted to report abuse to FFS administrators, to Hancock PD, to the Delaware County Sheriff's Office, and to Garnet Health, their reports were suppressed. Victims were threatened with additional punishment and work sanctions and instructed to remain silent or brought back to FFS. This coordinated suppression was the product of the Argiros family's financial and political control over Hancock County institutions as described herein.


**F. Paul Geer's Federal Criminal Conviction Established Evidence of Concealment**


84.    Defendant Paul Geer was prosecuted in the United States District Court for the Northern District of New York for sexual abuse committed against students at FFS and during school trips

48

across state lines. Geer was convicted following trial and sentenced to twenty-seven years in federal prison. This conviction constitutes direct judicial confirmation of the predicate acts of sex trafficking and transportation of minors for illegal sexual activity underlying Plaintiff's claims.

85.     During the course of Geer's federal criminal trial, evidence and testimony established that the Argiros Defendants intentionally destroyed documents relevant to the abuse at FFS by shredding them. This was confirmed by Michael Argiros's sworn deposition testimony from July 31, 2018, given in a private civil proceeding to which Plaintiff was not a party and to which Plaintiff had no access, and which therefore did not and could not have put Plaintiff on notice of the destruction. It was not until the evidence and testimony adduced at Geer's public federal criminal trial that Plaintiff first became aware that student files, counseling records, and other documentation had been deliberately shredded by the Argiros Defendants after FFS had been sued civilly and while Argiros was personally concerned about his own civil exposure. It was not until the criminal trial that Plaintiff first became aware of the visa application with her forged signature and about the fact that her tuition was classified as "charitable contributions" to conceal the discovery of her trafficking without proper immigration status.

86.     The deliberate shredding of records constitutes: (a) spoliation of evidence giving rise to an adverse inference that the destroyed records contained information damaging to Defendants and favorable to Plaintiff; (b) an affirmative act of concealment in furtherance of the conspiracy; (c) obstruction of justice; and (d) fraudulent concealment independently tolling all applicable statutes of limitations from the date of shredding through the date Plaintiff first acquired knowledge thereof through the public proceedings of Geer's federal criminal trial. Plaintiff's ignorance was not for want of diligence: diligence was exercised and was punished. Students who carried reports of abuse to FFS administration, to Hancock PD, to the Delaware County

49

Sheriff's Office, and to Garnet Health had those reports suppressed, were threatened with work sanctions, and were returned to the institution. Where the very channels through which a reasonably diligent victim would investigate. The institution's management, local law enforcement, and treating medical providers are themselves participants in the concealment, further inquiry is not merely unavailing but dangerous, and the law does not charge a victim with notice of facts that the defendants' own suppression apparatus ensured no reasonable inquiry could uncover. Nor does the general notoriety of abusive conditions at FFS, including the publicity attending its 2014 closure, defeat tolling: what was publicly known was that FFS was abusive, a fact Plaintiff knew firsthand; what remained concealed, and what these claims are made of, was the existence and structure of the enterprise itself — its financial architecture, its coordinated suppression of reporting, its referral network, and its deliberate destruction of records — facts that were not publicly established until the FBI's investigation and the February 2025 criminal trial, and that no diligence by Plaintiff could have uncovered while Defendants were actively and successfully destroying and suppressing the evidence of them.

87.     FFS, through its carrier Zurich Insurance, has previously paid private civil settlements to other victims of FFS arising from the same pattern of abuse alleged herein, further establishing Defendants' prior notice and knowledge of the pervasive and continuing nature of the enterprise.

**G. Evidence Established at the Geer Federal Criminal Trial**

88.     The following facts were established through sworn testimony and evidence adduced at Geer's federal criminal trial. This evidence confirms the institutional knowledge, deliberate

50

concealment, and enterprise structure alleged herein and establishes the basis for Plaintiff's fraudulent concealment tolling argument:

89. **Argiros Family Ownership and Control.** Defendant Michael Argiros testified that his parents owned the FFS property, his father served as executive director, his mother as program director, and that he became president of the board in 1993 and was actively involved in day-to-day operations throughout the relevant period.

90. **Institutional Knowledge and Retention of Geer.** FFS administration was aware of Geer's pattern of aggression toward students; Geer openly self-identified as a sex addict to FFS leadership; Geer discussed masturbation with minor students during mandatory "table topic" sessions; and multiple prior complaints had been made against Geer by other students before his abuse of Plaintiff. Defendant Michael Argiros personally acknowledged to the FBI that he knew Paul Geer was sadistic. Despite this knowledge, Geer was never terminated, never reported to law enforcement, and never reported to child protective services or any state authority. By contrast, trial testimony confirmed that FFS fired at least three other staff members — Ken Rivers, Curtis Newsom, and Sal Gorino for sexual misconduct and referred each to law enforcement, while Geer was merely removed as family leader in 2010 and retained on staff.

91. **Deliberate Concealment from Parents.** Defendant Michael Argiros testified he never disclosed to parents or to students that Geer was a self-described sex addict, berated children, or that the administration harbored concerns about his conduct. Trial testimony further acknowledged that a coverup of Geer's conduct was possible. Parents who were never informed of these facts were rendered wholly incapable of making an informed decision to remove their children from FFS or pursue claims on their children's behalf.

92.    **Strip Searches Confirmed Under Oath.** Michael Argiros confirmed under oath that students were required to remove their clothes during searches in front of at least one adult and often two, and in some instances in front of other students.

93.    **Forced Labor Confirmed by Witness Testimony.** Multiple witnesses confirmed that FFS students were compelled to perform labor that directly and financially benefited the Argiros family without compensation and under threat of severe punishment, including mandatory care of Argiros family livestock, mandatory construction and maintenance work on the Argiros family estate, and mandatory meal preparation for the Argiros family, its staff-members and its students. Witnesses confirmed that labor sanctions were ordered and enforced by Defendant staff members. Witnesses further confirmed that purely punitive labor, including carrying five-gallon buckets of rocks, was imposed as a mechanism of psychological coercion, and that students understood that failure to comply meant, in one witness's words, to "pretty much die here."

94.    **No System for Reviewing Abuse Complaints.** A regulatory letter admitted at trial confirmed FFS had no system to review, document, investigate, or report complaints of abuse. Administrators acknowledged at trial a previous culture of harsh treatment at FFS. Defendant Susan Runge, the designated recipient of abuse complaints, testified she could not confirm the total number of complaints received during her tenure, could not confirm she received all complaints, and could not describe any review process. By her own admission she received three complaints of sexual abuse, addressed each solely through staff termination and purported referral to Hancock PD, and implemented no reporting protocols, staff training, or systemic safeguards. However, there are no identifiable records of such arrests or criminal prosecutions thereafter.

95.    **Retaliation Against Reporting Student.** A key witness testified that he directly reported Geer's sexual abuse to Michael Argiros, who took no disciplinary action and made no law enforcement report. Following the report, Defendant Geer personally sanctioned the reporting student, confirming that Geer knew his conduct had been reported to the school's owner and that no consequences would follow. This coordinated non-response between Argiros and Geer establishes the enterprise relationship between them as distinct from an ordinary employer-employee failure of supervision.

96.    **Choir as Mechanism for Isolation and Access.** Trial testimony confirmed that Defendant Geer used choir practice to isolate minor students from supervision and that the choir program was financially important to FFS and actively used in public marketing to secure tuition payments from parents, school districts, and referring agencies. The enterprise's financial dependence on the choir program directly explains the decision to retain Geer despite actual knowledge of his conduct.

97.    **Town of Hancock Financial Nexus.** Trial testimony confirmed that affluent members of the Hancock community funded the original construction of the FFS campus, corroborating the community's financial investment in the enterprise and the economic entrenchment set forth in Section A.1 above. That economic dependence is what enabled FFS to operate without proper licensure for decades while Hancock PD and the Delaware County Sheriff's Office suppressed the abuse reports made by FFS students.

**H. Villa Veritas Foundation: Continuing Failure to Treat and Enterprise Concealment**

53

98.    Villa Veritas Foundation Inc. appeared in FFS's marketing and referral materials as a recommended post-enrollment treatment destination, establishing the enterprise's use of Villa Veritas as a downstream referral recipient within the FFS pipeline through which FFS directed former students whose untreated conditions made them dependent on continued residential treatment.

99.    Villa Veritas Foundation operated as a recommended post-enrollment treatment provider within the FFS referral network, absorbing former FFS students whose untreated conditions made them dependent on continued residential treatment into a treatment framework that did not identify, investigate, or report the institutional source of those conditions, thereby continuing the chain of institutional concealment that prevented former students from discovering the true nature of the enterprise responsible for their injuries.

## I. Plaintiff's Damages

100.    Following her departure from FFS, the consequences of Defendants' conduct manifested over time. Plaintiff was unable to pursue or complete college for many years as a result of the psychological injuries inflicted by Defendants' conduct and the loss of any valid academic credit for her high school years. The untreated psychological and behavioral conditions with which Plaintiff entered adulthood, together with the lasting eating disorder and body-image impairment inflicted at FFS, persisted and worsened into adult life — including a substance-use disorder, culminating in approximately a decade of opiate addiction, that developed only after and as a result of her confinement and her need for psychiatric and psychological care dating back to at

54

least 2008 has gone unmet because she has been unable to obtain employment providing health-insurance benefits.

101. Throughout that period, Plaintiff's injuries were continuous, progressive, and ongoing. Plaintiff has required psychiatric and psychological treatment dating back to at least 2008 and, because such care is effectively inaccessible through Ontario's overwhelmed public system and otherwise available only at out-of-pocket cost or through employment-based health benefits that Plaintiff lacks, has been unable to obtain the treatment her condition requires, leaving her injuries untreated and ongoing.

102. The public disclosure of Defendant Geer's federal criminal indictment initiated a period of severe and progressive psychological deterioration. For the first time, Plaintiff was confronted with public confirmation of the true nature of the enterprise responsible for her conditions, including that she failed to receive any treatment necessary for her underlying conditions while at FFS, that records had been deliberately shredded, that she was effectively kidnapped from her country and trafficked to the United States undocumented, that she was harbored as an undocumented child undetected for several years, that she was never enrolled in the school thereby depriving her of necessary educational years as part of Defendants' concealment of their crimes, and that the institution had operated as a systematic enterprise designed to exploit vulnerable children for financial gain. The psychological impact of these disclosures compounded the unresolved trauma Plaintiff had carried since adolescence.

103. As a direct and proximate result of Defendants' conduct, including their failure to properly treat her as a minor during a critical period of adolescent development, Plaintiff has suffered severe and permanent psychological injury, a lasting eating disorder and body-image impairment, and a delay of approximately twenty years in her earning capacity caused by the loss

of her education. Plaintiff has incurred and continues to incur psychiatric and psychological treatment needs dating back to at least 2008 that she has been unable to satisfy because such care is effectively inaccessible through Ontario's overwhelmed public system and otherwise available only at out-of-pocket cost or through employment-based health benefits that Plaintiff lacks, and has suffered the denial of timely medical care.

104.    Plaintiff did not discover, and could not reasonably have discovered, the true nature of the racketeering enterprise through which she was trafficked until the public proceedings of Geer's federal criminal trial in February 2025 and the evidence there disclosed. Plaintiff's RICO claim is timely because, at the earliest, the limitations period began to run upon that discovery, and is independently tolled by Defendants' fraudulent concealment and the overt acts of concealment committed in furtherance of the conspiracy within the limitations period.

105.    As a direct and proximate result of Defendants' conduct, Plaintiff's earning capacity has been reduced by approximately twenty years by reason of the loss of her education. Plaintiff additionally suffers from severe and ongoing emotional distress; a lasting eating disorder and body-image impairment; unmet psychiatric and psychological treatment needs dating back to at least 2008 that she has been unable to satisfy because such care is effectively inaccessible through Ontario's overwhelmed public system and otherwise available only at out-of-pocket cost or through employment-based health benefits that Plaintiff lacks; the denial of timely medical care, including gynecological symptoms dismissed and left untreated during her confinement that were later diagnosed as endometriosis and that contributed to multiple miscarriages and, in January 2025, a hysterectomy; the profound and lasting damage to Plaintiff's relationships with her mother, father, brother, and extended family, engineered by Defendants' deliberate practice of giving parents and children conflicting accounts and pitting them against each other to

preserve tuition revenue, which required decades of effort to repair; loss of enjoyment of life; and such other damages as shall be proven at trial.

## TOLLING OF STATUTES OF LIMITATIONS

106.    Plaintiff's RICO claim is timely. Plaintiff did not discover the true nature of the racketeering enterprise until the public proceedings of Geer's federal criminal trial in February 2025 and the evidence there disclosed, and the limitations period began to run, at the earliest, upon that discovery. Independently, *all applicable limitations periods are tolled* by Defendants' fraudulent concealment, the self-concealing nature of the conspiracy, and the overt acts of concealment committed in furtherance of the conspiracy within the limitations period, as set forth in the Tolling section supra.

107.    Independently and alternatively, all applicable statutes of limitations are tolled on each of the following independent grounds:

(a)    **Fraudulent Concealment.** To establish fraudulent concealment tolling a plaintiff must show: (i) the defendant concealed the existence of the cause of action; (ii) the plaintiff failed to discover the cause of action within the limitations period; and (iii) the plaintiff's ignorance was not attributable to a lack of reasonable diligence. All three elements are met here with unusual force. Defendants engaged in a coordinated, multi-layered, multi-institutional scheme of affirmative concealment including: (i) FFS staff including Defendant Geer threatened Plaintiff and other students with physical punishment and work sanctions if they reported abuse; (ii) Hancock PD officers and

57

Delaware County Sheriff's Office personnel, acting under the financial and political influence of the Argiros family, suppressed abuse reports and directed students to remain silent, depriving Plaintiff of the law enforcement channel through which she would ordinarily have discovered and pursued her claims; (iii) Garnet Health personnel failed to report abuse-consistent presentations in furtherance of the concealment, eliminating the independent medical evidentiary record that would have enabled Plaintiff to discover her claims; (iv) the Argiros Defendants admittedly and deliberately shredded student records, abuse complaints, and institutional documentation as confirmed by testimony at Geer's federal criminal trial, directly depriving Plaintiff of the evidentiary record necessary to discover and assert her claims; and (v) Defendant Lynda Drake, as the school nurse, failed to report abuse-consistent conditions directly known to her, eliminating yet another institutional channel through which Plaintiff might have discovered the enterprise's true nature. Plaintiff did not and could not through reasonable diligence have discovered the full scope of the enterprise within any applicable limitations period. The limitations period on all claims began to run, at the earliest, upon Plaintiff's discovery of the enterprise's true nature through the public proceedings of Geer's federal criminal trial.

(b)      **Self-Concealing Conspiracy.** The racketeering enterprise was specifically structured to prevent victims from connecting their individual experiences to the broader enterprise. The enterprise's mechanisms of isolation — the complete severance of students from family, friends, outside counsel, mental health professionals, and access to information about the outside world — were themselves instruments of concealment rendering victims structurally incapable of discovering the enterprise during enrollment

or for years thereafter. The self-concealing nature of the conspiracy tolls all applicable limitations periods for as long as those mechanisms remained effective.

(c)    **Overt Acts Within the Limitations Period.** The deliberate shredding of student records by Argiros constitutes an overt act in furtherance of the conspiracy committed within the limitations period, as established by Argiros's sworn deposition testimony from July 31, 2018 and confirmed at Geer's criminal trial through testimony in February 2025. This act was committed during active civil litigation for the specific purpose of preventing victims from proving their claims. Additionally, Argiros's evasive testimony at Geer's criminal trial — denying recollection of the shredding, mischaracterizing the records shredded, then failing to publicize this act — constitutes a further independent overt act of concealment in furtherance of the conspiracy falling entirely within the limitations period. The retention of student files, abuse complaints, institutional records, and other documentation in a shed on the FFS property following its fraudulent transfer to Chapel Hill Land Holdings LLC constitutes a further independent overt act of concealment falling entirely within the limitations period.

108.    All statutes of limitations applicable to Plaintiff's federal and state claims, including without limitation Plaintiff's claims under 18 U.S.C. § 1962, 18 U.S.C. § 1589, 18 U.S.C. § 1590, 18 U.S.C. § 1591, and New York Civil Practice Law and Rules § 208(b), are independently tolled by each of the foregoing grounds.

108-A. Plaintiff's claims under 18 U.S.C. §§ 1589, 1590, 1591, and 1594, brought through the civil remedy of 18 U.S.C. § 1595, are timely under 18 U.S.C. § 1595(c). All limitations periods applicable to those claims are tolled by Defendants' fraudulent concealment, the self-concealing nature of the conspiracy, and the equitable tolling grounds set forth in this section, and began to

run, at the earliest, upon Plaintiff's discovery of the enterprise's true nature through the public proceedings of Defendant Paul Geer's February 2025 federal criminal trial.

109.    The statute of limitations applicable to Plaintiff's claims arising from Defendants' negligent failure to provide promised therapeutic services is independently tolled by: (a) fraudulent concealment :Defendants actively concealed the absence of any qualified therapeutic staff or meaningful treatment program through the deliberate use of licensed professionals' names and credentials in representations to parents, courts, and school districts, preventing Plaintiff from discovering that no treatment was ever provided; (b) the discovery rule : Plaintiff could not have known that FFS employed no qualified treatment professionals and provided no meaningful therapeutic services until those facts were established through sworn testimony at Defendant Geer's federal criminal trial; and (c) continuous harm :the psychological deterioration resulting from untreated mental health and substance abuse conditions continued and worsened from 2005 through the present. All applicable statutes of limitations on these claims began to run, at the earliest, upon public disclosure through the Geer criminal proceedings.

110.    Defendants are estopped from asserting any statute of limitations defense. A defendant cannot invoke the protection of a limitations period that its own wrongful conduct caused the plaintiff to miss.

## CAUSES OF ACTION[1]

### COUNT I — CIVIL RICO (18 U.S.C. § 1962(c))

*(Against All Defendants)*

111.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**The Enterprise.**

112.    At all relevant times, Defendants constituted an enterprise within the meaning of 18 U.S.C. § 1961(4), as an association-in-fact that operated through the FFS institution as its primary vehicle but was structurally distinct from any individual defendant. The enterprise existed as an ongoing organization with its own staff hierarchy, marketing apparatus, referral network, physical campus, and financial infrastructure that persisted independently of any particular predicate act. The enterprise shared the common purpose of enriching the Argiros family through tuition fraud, forced child labor, and sexual exploitation of minors, and operated as a continuing unit for decades.

113.    Each Defendant knowingly participated in the conduct of the enterprise's affairs as follows: the Argiros Defendants owned, operated, and directed the enterprise; Defendant Betty Argiros co-founded and co-operated the enterprise and designed the institutional policies through

---

[1] Plaintiff reserves all rights to assert a claim under the New York Child Victims Act (N.Y. C.P.L.R. § 214-g) if and when the lookback window re-opens, as it is currently pending decision before the New York State Legislature.

61

which the predicate acts were committed; Defendant Geer directly committed predicate acts of sex trafficking and forced labor; Defendant Diane Geer supervised and enforced work sanctions and failed to fulfill her mandatory reporting obligations; Defendant Lynda Drake participated in the enterprise's concealment by failing to report in her role as school nurse; the Village and Hancock PD protected the enterprise from law enforcement scrutiny in exchange for financial and political benefits; the Delaware County Sheriff's Office and Board of Supervisors permitted unlicensed operation and suppressed abuse reports across the county; Garnet Health suppressed mandatory abuse reports protecting its revenue stream from FFS patient referrals; Defendant Nancy Edwards recruited and solicited Plaintiff's family and procured Plaintiff's placement at FFS and Quest for a direct fee and, upon information and belief, referral fees despite publicly available records of documented abuse, and Defendant Quest Family Services Inc. and its principals operated the wilderness program that fed children, including Plaintiff, into FFS, and dispatched Plaintiff from Utah to Buffalo, New York with advance knowledge that her destination was FFS in Hancock, New York; Defendants Brain, Fras, and Runge lent false professional legitimacy to the enterprise's fraudulent therapeutic representations while receiving direct financial compensation; Villa Veritas Foundation Inc. and Suzanne Cusack participated in the enterprise's post-enrollment concealment pipeline; Lackawanna College lent academic credibility to the enterprise while its on-campus instructors observed and failed to report conditions; NATSAP lent membership legitimacy to FFS's fraudulent marketing representations; The Hancock Herald lent membership legitimacy to FFS's fraudulent marketing representations; NBT Bank, N.A. and NBT Bancorp Inc. processed the enterprise's tuition revenue and payroll for over two decades through their sole branch in the Village of Hancock while recklessly disregarding extensive community and public knowledge of the enterprise's abusive conduct;

Kasos Co Family LP facilitated the below-market fraudulent transfer of the FFS campus; Kasos Enterprises LLC and related entities maintain the Argiros family's ongoing financial entrenchment in Village institutions; K9-5 Inc. provided coercive infrastructure through training and deploying dogs to return runaway students.

(a)     The Argiros Defendants owned, operated, and directed the enterprise; made all decisions regarding staffing, student control, and suppression of abuse reports; personally committed predicate acts including record destruction; and financially benefited from every aspect of the enterprise's operation.

(b)     Defendant Betty Argiros co-founded and co-operated the enterprise, designed and implemented the institutional policies through which the predicate acts were committed — including the table topic disclosure system, the strip search intake procedure, the work sanction coercive apparatus, and the family leadership structure — and exercised direct supervisory authority over the enterprise's daily operation throughout the relevant period. Her participation was not peripheral but foundational: the enterprise's predicate acts were carried out pursuant to the policies she designed and the institutional culture she established.

(c)     Defendant Geer directly committed predicate acts of sex trafficking and forced labor, used his institutional position and the choir program to access and isolate victims, coordinated with Defendant Argiros to suppress abuse reports through immediate retaliation against reporting students, and received direct financial compensation and institutional protection from the enterprise in exchange for his role.

(d)     Defendant Diane Geer participated in the enterprise by enforcing work sanctions against enrolled students including Plaintiff as an active instrument of the coercive

control apparatus; possessing actual or constructive knowledge of her husband's pattern of conduct through sustained presence on the same campus; and failing to fulfill her mandatory reporting obligations as a teacher, thereby enabling the abuse to continue and protecting the enterprise from law enforcement intervention.

(e)     Defendant Lynda Drake participated in the enterprise's concealment by failing to fulfill her mandatory reporting obligations as both a licensed medical provider and an EMT despite treating students presenting with conditions consistent with physical abuse, sexual abuse, and forced labor; and by receiving compensation from the enterprise in exchange for medical services that lent the institutional appearance of health monitoring while she took no action to report or intervene.

(f)     The Village and Hancock PD knowingly protected the enterprise from law enforcement scrutiny in exchange for the ongoing financial and political benefits derived from the Argiros family's patronage, as evidenced by: the founding financial contributions of Hancock community members to the FFS campus; the Village's ongoing promotion of Argiros-owned businesses; Argiros's role as Chamber of Commerce Treasurer; the Village's decades-long permission of unlicensed operation; and Hancock PD's systematic suppression of abuse reports from multiple students across multiple years.

(g)     The Delaware County Sheriff's Office and Delaware County Board of Supervisors participated in the enterprise's concealment and enabled its continued operation by suppressing abuse reports from FFS students, failing to investigate known incidents involving minor students documented in county law enforcement records, returning runaway students to FFS without inquiry, and permitting FFS to operate without proper

licensure for decades within Delaware County — each constituting an affirmative act in furtherance of the enterprise's suppression scheme.

(h)     Garnet Health knowingly participated in the enterprise's concealment by suppressing mandatory abuse reports from FFS students presenting with conditions consistent with physical and sexual abuse, thereby protecting its recurring revenue stream from FFS patient referrals. By 2002, publicly available records gave Garnet Health constructive knowledge that FFS operated as an abusive institution, rendering its continued failure to report knowing rather than merely negligent.

(j)     Defendants Brain, Fras, and Runge lent false professional legitimacy to the enterprise's fraudulent representations to parents, courts, and referring agencies by permitting their names and credentials to be used in representations they knew to be false — representations that were material inducements to parents, families, and referring consultants to place and retain students at FFS while receiving direct financial compensation from the enterprise.

(k)     Defendant Villa Veritas Foundation Inc. and Defendant Suzanne Cusack knowingly advanced and benefited from the enterprise by: appearing in FFS marketing materials as a recommended post-enrollment treatment provider, lending credibility to FFS's pipeline; receiving financial compensation from former FFS students and their families as a direct result of the enterprise's failure to treat enrolled students; and failing during both of Plaintiff's treatment episodes to investigate or disclose the institutional source of the conditions they were treating, thereby continuing the chain of concealment that prevented Plaintiff from discovering the enterprise's true nature.

(l)      Defendant Lackawanna College knowingly advanced the enterprise by providing credentialed instructors who were physically present on the FFS campus, lending academic legitimacy to FFS's marketed educational program, and receiving financial compensation from FFS in exchange for a credentialing relationship used in FFS's marketing to parents, courts, and school districts as evidence of institutional legitimacy all while Lackawanna College's physically present instructors observed and failed to report the conditions on the FFS campus.

(m)     Defendant NATSAP knowingly advanced the enterprise by accepting FFS as a founding member, lending FFS the institutional legitimacy of its membership designation, publishing and promoting that membership in materials used by referring families, agencies, and consultants, and collecting membership dues from FFS — all while possessing industry-wide knowledge sufficient to establish constructive knowledge of the abuse, unlicensed operation, and absence of qualified professional staff that FFS's NATSAP membership implicitly certified did not exist.

(o)      Kasos Co Family LP facilitated the below-market fraudulent transfer of the FFS campus to Chapel Hill Land Holdings LLC to assist in shielding enterprise assets from civil creditors.

(p)      Kasos Enterprises LLC and related entities maintain the Argiros family's ongoing financial entrenchment in Village institutions enabling continued concealment of the enterprise's conduct.

(q)      K9-5 Inc. provided coercive infrastructure through the training and deployment of dogs to return runaway students.

(r)    NBT Bank, N.A. and NBT Bancorp Inc. knowingly advanced and benefited from the enterprise by processing the recurring substantial tuition payments and payroll disbursements of the enterprise through NBT Bank's sole branch in the Village of Hancock for more than two decades, and by receiving substantial fee, float, and deposit-based financial benefit from that relationship while recklessly disregarding extensive publicly available information and direct community knowledge establishing FFS's abusive and unlicensed operation.

(s)    The Hancock Herald, owned and operated by Cindy Argiros under her maiden name to conceal the relation, concealed the true nature of the enterprise by contributing to FFS's fraudulent marketing to the public.

## Pattern of Racketeering Activity.

114.    Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), including the following predicate acts committed repeatedly over a period exceeding ten years:

(a)    **Sex Trafficking of Minors — 18 U.S.C. § 1591.** Defendants recruited, transported, harbored, and obtained minors, including Plaintiff, for purposes of commercial sexual exploitation. Because Plaintiff and other victims were minors, no proof of force, fraud, or coercion is required. Geer's federal conviction directly confirms this predicate act.

67

(b)      **Forced Labor — 18 U.S.C. § 1589.** Defendants obtained labor and services from Plaintiff and other minor students through force, threats of physical harm, and a scheme of coercion, all in furtherance of constructing and maintaining the Argiros family estate. The labor was performed without compensation and without consent.

(c)      **Transportation of Minors for Illegal Sexual Activity — 18 U.S.C. §§ 2421-2423 (Mann Act).** Defendants transported Plaintiff and other minor students across state lines and international borders under the guise of school trips for the purpose of facilitating sexual abuse. The enterprise transported minor students, including Plaintiff, across state lines and international borders — including Plaintiff's transport, at the direction of Defendant Emmanuel Argiros, as a foreign minor from Canada through Utah to FFS in Hancock, New York  in furtherance of the venture. The intended destination of each such transport of Plaintiff was an institution that Defendant Emmanuel Argiros knew operated the sexualized regime described herein, constituting criminal sexual activity against minors under New York law; the intent that a minor engage in criminal sexual activity need only have been one of the purposes of the transport, and it was. Plaintiff's initial transportation to FFS routed from Canada through Buffalo, Erie County, New York, at the direction of Defendant Emmanuel Argiros. Each leg of transportation in furtherance of sexual exploitation constitutes a discrete predicate act.

(d)      **Mail and Wire Fraud — 18 U.S.C. §§ 1341, 1343.** Defendants used the United States mail and interstate wire communications to transmit fraudulent recruitment materials, to collect tuition payments and referral fees, and to advance the scheme to defraud families and state agencies regarding the true nature of FFS and its referral network. With respect to Plaintiff, these acts included: the preparation and forging of a

United States visa application bearing Plaintiff's forged signature in order to retain her at FFS and sending such forged application through the mails; the interstate and cross-border communications and transportation by which Plaintiff was moved from Canada through Utah to FFS in Hancock, New York; the transmission, upon information and belief, of referral fees to Defendant Nancy Edwards from both Defendant Quest Family Services Inc. and Defendant FFS; and the transmission of tuition funds from Plaintiff's grandfather to Plaintiff's mother and the resulting tuition payments transmitted to FFS by check through the mails; the mailing to Canada of the forged visa application for signature and submission; and the interstate and international telephone communications in or about January 2003 by which FFS represented to Plaintiff's mother in Ontario, Canada that withdrawing Plaintiff before June would forfeit an academic year's credits that FFS knew did not exist, thereby inducing continued enrollment and the payment of approximately five additional months of tuition. Each such mailing and wire transmission in furtherance of the scheme constitutes a discrete predicate act of mail or wire fraud.

**Continuity.**

115.    The pattern of racketeering activity spanned multiple decades, encompassed numerous victims, and employed the same methods consistently over time, satisfying both closed-ended and open-ended continuity requirements.

**Conduct of the Enterprise.**

116.    Each Defendant conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(c).

**Causation and Damages.**

117.    Plaintiff was injured in her business and property by reason of Defendants' racketeering activity. Defendants obtained substantial tuition paid on Plaintiff's behalf for an education and enrollment they never provided, concealing that Plaintiff was never lawfully enrolled in or credited for any accredited schooling; that tuition was a total economic loss — money paid for which nothing was delivered including approximately five additional months of tuition extracted in 2003 through the misrepresentation that early withdrawal would forfeit academic credits that did not exist. As a direct and proximate result, Plaintiff lost the secondary-school credit she believed she was earning, was told at approximately seventeen and one-half years of age that she would be required to repeat the ninth grade and instead obtained her GED as the equivalent of a high-school diploma, was set back at least four years, and incurred the out-of-pocket costs of later obtaining a GED and belatedly pursuing college (costs she would not have incurred but for Defendants' fraud) while being completely unable to obtain employment commensurate with the education for which Defendants had been paid. These are concrete financial injuries to Plaintiff's business and property, independent of any physical or psychological injury and directly traceable to Defendants' racketeering in an amount not less than $5 million. Plaintiff is entitled to recover

70

threefold that amount, or not less than $15 million, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

**Statute of Limitations.**

118.    Plaintiff's 2025-2026 economic injuries constitute fresh injuries under the Second Circuit's separate accrual rule, each triggering an independent four-year limitations period running from the date each injury accrued. Independently, all applicable limitations periods are tolled as set forth in the Tolling section supra.

## COUNT II — RICO CONSPIRACY (18 U.S.C. § 1962(d))

*(Against All Defendants)*

119.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

120.    Each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c) — that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of the racketeering enterprise described in Count I through a pattern of racketeering activity — in violation of 18 U.S.C. § 1962(d). Each Defendant knew of the essential nature and scope of the enterprise and its scheme and knowingly agreed to participate in, facilitate, and further it. As set forth in Count I, the pattern of racketeering activity through which the enterprise operated included acts of sex trafficking in violation of 18 U.S.C. § 1591, forced labor in violation of 18 U.S.C. § 1589, the transportation of minors in furtherance thereof, and the obstruction and concealment that sustained the enterprise over time. It is not necessary that any Defendant personally committed, or agreed personally to commit, a predicate act; it is sufficient under 18 U.S.C. § 1962(d) that

71

each Defendant knowingly agreed to facilitate a scheme which, if completed, would constitute a violation of § 1962(c), and adopted the goal of furthering or facilitating the criminal endeavor.

121.    Plaintiff was injured in her business and property by reason of predicate acts of racketeering committed in furtherance of the conspiracy, and is entitled to recover threefold the damages she sustained, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT III — SEX TRAFFICKING OF A MINOR: PERPETRATOR LIABILITY (18 U.S.C. §§ 1591(a)(1) AND 1595)

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Nancy Edwards, Quest Family Services Inc., and Karen Wells)*

122.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

123.    Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Nancy Edwards, Quest Family Services Inc., and Karen Wells are liable as perpetrators under 18 U.S.C. § 1595 for their violations of 18 U.S.C. § 1591(a)(1), in that they recruited, enticed, harbored, transported, provided, and obtained Plaintiff, a minor, into and for the benefit of a venture that they knew and operated and that engaged in the commercial sexual exploitation of the minor students in its custody. Each perpetrator Defendant named in this Count personally committed one or more of the acts enumerated in § 1591(a)(1), and the individualized acts alleged throughout this Complaint, including Defendant Emmanuel Argiros's direction of Plaintiff's recruitment and transport, Defendant Nancy Edwards's recruitment and enticement of

72

Plaintiff, Defendant Quest Family Services Inc.'s and Defendant Karen Wells's harboring, transport, and provision of Plaintiff from Quest's Utah facility, and the harboring, obtaining, and maintaining of Plaintiff at FFS by Defendants Education Plus Corp., Betty Argiros, and Cindy Argiros are pleaded by way of illustration and not limitation. All perpetrator Defendants acted in concert, in and for the benefit of a single venture, and each is jointly and severally liable for the acts of the venture committed in its furtherance. Plaintiff, a foreign minor, was recruited and brought to the United States, transported, at the direction of Defendant Emmanuel Argiros, through Buffalo, New York to the Quest program in Utah and onward to FFS, all on Defendants' assurances that they would handle her immigration status, harbored at FFS where Defendants later forged her signature on a visa application to retain her, and subjected to a sexualized institutional regime — including sexualized "table topic" sessions in which she was degraded and compelled to disclose intimate sexual matters, exposure to the sexualized conduct of a visibly aroused adult male staff member directly in front of her, and retaliatory sexual accusations and restrictions as part of that venture. The perpetrator Defendants knew, and in reckless disregard of the fact, that the venture into which Plaintiff was recruited, harbored, and transported engaged in the sexual exploitation of minors for financial gain. Defendant Nancy Edwards recruited and enticed Plaintiff into that venture within the meaning of § 1591(a)(1), soliciting Plaintiff's family in exchange for a fee of approximately $3,000 and, upon information and belief, referral fees from both Quest and FFS, and did so in reckless disregard of publicly available records documenting abuse at FFS, including the formal public cease and desist order issued to FFS by the New York State Division of Alcoholism and Alcohol Abuse in August 1990. Defendant Quest Family Services Inc. likewise harbored, obtained, transported, and provided Plaintiff within the meaning of § 1591(a)(1): it took and held custody of Plaintiff, a

73

minor, at its Utah facility for approximately seventy-eight days under coercive conditions through which she was conditioned by fear and isolation, and it then directly sent and released Plaintiff, still a minor, from its facility, dispatching her on the flight from Utah to Buffalo, New York with advance knowledge that her destination was the FFS campus in Hancock, New York thereby transporting, providing, and delivering Plaintiff into the venture in exchange for referral fees and reciprocal enrollment revenue, and in reckless disregard of publicly available records documenting abuse at the institution to which it delivered her, including the August 1990 cease and desist order issued to FFS by the New York State Division of Alcoholism and Alcohol Abuse. Defendant Karen Wells, as Quest's owner, officer, and operator, personally directed and controlled each of those acts — Quest's receipt and custody of Plaintiff, her confinement at the Utah facility, and her release and dispatch, while still a minor, on the flight from Utah to Buffalo, New York with advance knowledge of her destination at FFS and Wells's knowledge, acquired within the scope of her duties as Quest's principal, is both her own and imputed to Quest; she is individually liable for those acts under § 1591(a)(1).

124.    The tuition paid by Plaintiff's family to FFS constitutes "anything of value" under 18 U.S.C. § 1591, as the financial arrangement between FFS and students' families was integral to the sexual exploitation scheme. The sexualized regime to which Plaintiff was subjected occurred within, and as a function of, a program for which tuition was continuously paid, and the enterprise separately charged families, including $150 per night for isolation sanctions, for the very coercive practices through which that regime was enforced; things of value were accordingly given and received on account of that conduct within the meaning of § 1591(e)(3).

125.    Because Plaintiff was under 18 years of age at the time of the conduct, proof of force, fraud, or coercion is not required under 18 U.S.C. § 1591(a). Nonetheless, Defendants used all

three: force through the work sanction system and direct physical assault; fraud through systematic misrepresentation to Plaintiff and her family; and coercion through a comprehensive system of institutional fear, work sanction physical coercion, and explicit threats of retaliation.

126.    Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including damages, attorneys' fees, and costs. All applicable statutes of limitations are tolled as set forth supra.

## COUNT IV — CIVIL RECOVERY FOR KNOWING BENEFICIARIES OF SEX TRAFFICKING (18 U.S.C. § 1595)

*(Against All Defendants)*

127.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

128.    Each Defendant is liable under 18 U.S.C. § 1595 as a knowing beneficiary of the sex trafficking venture. Section 1595 imposes civil liability on any person or entity that knowingly benefits, financially or by receiving anything of value, from participation in a venture that the person knew or should have known was engaged in sex trafficking in violation of § 1591. This "knew or should have known" standard is independent of, and materially lower than, the actual-knowledge standard applicable to the perpetrator Defendants named in Count III. This Count is pleaded against all Defendants, including the Count III perpetrator Defendants, as to whom it proceeds in addition and in the alternative. Participation in a venture for purposes of this Count does not require participation in the sex trafficking itself — the provision of services to, and the maintenance of a continuous commercial relationship with, the venture suffices; the receipt of fees, tuition-derived revenue, referral income, deposits, and other revenue from the venture satisfies the benefit element, without any requirement that the benefit have been received in

exchange for furthering the trafficking; constructive knowledge is satisfied where a defendant ignored red flags and recklessly disregarded what was plainly to be seen, including by failing to conduct due diligence in the face of publicly available reports; and the knowledge of a defendant's agents, acquired within the scope of their duties, is imputed to their principals. The venture operated as a single, continuous enterprise from at least 1990 through the school's 2014 closure and thereafter through the concealment and disposition of its assets, and Plaintiff's victimization occurred within and as part of that continuing venture. Section 1595 attaches a civil remedy to conduct that was criminal under §§ 1589 and 1591 when committed against Plaintiff; its application here is remedial and raises no retroactivity concern. In addition and in the alternative, each Defendant named in this Count continued to participate in, and to knowingly benefit from, the same continuing venture after December 23, 2008, including Defendant NBT Bank, N.A., whose account relationship with the enterprise and receipt of fees, float, and deposits continued without interruption through the enterprise's 2014 closure and beyond — such that the participation and benefit upon which liability under this Count rests fall squarely within the statute as amended. Each Defendant benefited as follows: Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, and Paul Geer received the tuition revenue that was the object of the venture; Garnet Health received recurring patient referral revenue from FFS while suppressing reports that would have ended the trafficking; Defendant Nancy Edwards, pleaded in this Count in the alternative to Count III, received her own direct fee along with, upon information and belief, referral fees from both Quest and FFS for procuring Plaintiff's placement, and Defendant Quest Family Services Inc. and its principals received financial benefit, in the form of referral fees and enrollment revenue from reciprocal student referrals, from the referral arrangement through which Plaintiff was delivered to FFS, Quest

76

having itself dispatched Plaintiff from Utah on a flight to Buffalo, New York with advance knowledge that her destination was FFS in Hancock, New York; Defendants Brain, Fras, and Runge received direct financial compensation while lending false professional legitimacy that enabled the enterprise to continue recruiting victims and collecting tuition; the Village of Hancock and Hancock PD received ongoing financial and political benefits from the Argiros family in exchange for institutional protection that enabled the trafficking to continue; the Delaware County Sheriff's Office and Delaware County Board of Supervisors each received the financial and political benefits of the Argiros family's county-wide economic influence in exchange for institutional protection each provided to the enterprise; Defendant Lynda Drake received direct compensation from the enterprise for nursing services that lent the institutional appearance of medical oversight while she failed to report trafficking-consistent conditions she directly observed as the school nurse; Defendant Diane Geer received compensation and personal benefit from the enterprise while actively enforcing its coercive apparatus and failing to fulfill her mandatory reporting obligations; Defendant Villa Veritas Foundation Inc. and Defendant Suzanne Cusack received financial benefit through Villa Veritas Foundation's participation in the enterprise's post-enrollment referral network and advanced the enterprise's concealment by absorbing former FFS students into a treatment framework without investigating or reporting its institutional source; Defendant Lackawanna College received financial compensation from FFS while its on-campus instructors provided the enterprise with an academic legitimacy shield; Defendant NATSAP received membership dues and promoted FFS's membership designation, each act of promotion constituting a knowing advancement of FFS's fraudulent therapeutic representations to referring institutions; Defendant NBT Bank, N.A. and Defendant NBT Bancorp Inc., as the sole bank operating in the Village of Hancock throughout

77

the relevant period, received substantial financial benefit in the form of account fees, processing fees, and float income on deposit balances representing several million dollars in aggregate tuition and payroll revenue processed through their Hancock branch, and — having maintained accounts for both Education Plus Corporation and the Argiros family members individually, giving NBT Bank direct visibility into both the enterprise's tuition revenue and the personal financial activity of the individuals who owned and operated it — knew or should have known that the substantial tuition revenue flowing into the enterprise's accounts was not being expended on the food, staffing, or operational costs ordinarily associated with a residential institution for minors, because the minor students enrolled at FFS were themselves providing that labor without compensation, and that the accumulation of those funds in accounts held by Emmanuel Argiros, Cindy Argiros, and Betty Argiros personally was inconsistent with the legitimate operation of a licensed therapeutic boarding school and consistent instead with the personal financial enrichment of the enterprise's operators through the forced labor and sex trafficking of the children in their custody, all of which NBT Bank recklessly disregarded by utterly failing to investigate, report, or terminate the account relationship; Kasos Co Family LP, Kasos Enterprises LLC, and Chapel Hill Land Holdings LLC received and hold real property and assets generated by and through the sex trafficking and forced labor enterprise; K9-5 Inc. was capitalized with and created out of the proceeds of the enterprise, maintains its corporate address on the FFS campus grounds, and held and deployed the dogs used to pursue and forcibly return students who attempted to escape, thereby both benefiting financially from the enterprise that funded its creation and supplying the coercive infrastructure that sustained it; The Hancock Herald, the only local newspaper serving the Village of Hancock and owned and published by Defendant Cindy Argiros under the name "Cindy Ray," received advertising revenue from Argiros-affiliated

78

businesses and published favorable coverage of FFS while suppressing any reporting of its abuse and unlawful conditions, thereby profiting from and advancing the enterprise that its press control helped shield from public scrutiny. Each of these Defendants knew or should have known that the enterprise was engaged in sex trafficking and forced labor based on publicly available records of documented abuse at FFS dating back to at least 1990. Those records include the August 1990 cease and desist order issued to FFS by the New York State Division of Alcoholism and Alcohol Abuse, a formal, public state enforcement action confirming FFS's unlicensed operation nearly a decade before Plaintiff was recruited.

129.    Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs from all Defendants jointly and severally. All applicable statutes of limitations are tolled as set forth supra.

## COUNT V — FORCED LABOR: PERPETRATOR LIABILITY (18 U.S.C. §§ 1589 AND 1595)

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Paul Geer, Diane Geer, Michael Losicco, Roxy Losicco, the Village of Hancock, Hancock PD, and Delaware County Sheriff's Office)*

130. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

131. 18 U.S.C. § 1589 prohibits obtaining labor or services from a person through force, threats of physical harm, physical restraint, abuse of legal process, or a scheme of coercion. Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Paul Geer, Diane Geer, Michael Losicco, Roxy Losicco, the Village of Hancock, Hancock PD, and the Delaware County Sheriff's Office directly obtained labor and services from Plaintiff and other minor students

through: (a) physical force and threats of physical harm; (b) a scheme of coercion through the work sanction system; and (c) psychological coercion creating a pervasive climate of fear and compliance. The labor was obtained without compensation and without consent. Defendant Betty Argiros designed and implemented the work sanction coercive apparatus through which forced labor was extracted from minor students and is directly liable as the architect of the forced labor scheme. Defendant Diane Geer actively supervised and enforced work sanctions against enrolled students including Plaintiff, directly participating in the extraction of forced labor. Defendants Michael Losicco and Roxy Losicco, as the family leaders directly responsible for Plaintiff's day-to-day supervision within Family 2, administered the coercive family structure through which work sanctions, isolation, and behavioral control were imposed upon Plaintiff —trial testimony having confirmed that work sanctions were ordered and enforced by family leaders and thereby directly participated in the scheme of coercion through which Plaintiff's labor was obtained. The Village and Hancock PD advanced the forced labor scheme by suppressing reports and returning runaway students to FFS, ensuring the continued availability of the student labor force. The Delaware County Sheriff's Office advanced the forced labor scheme by returning runaway students to FFS without inquiry into the conditions from which they had fled, thereby facilitating the enterprise's continued extraction of free labor from minor students.

**132.** Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable statutes of limitations are tolled as set forth supra.

**COUNT VI — CIVIL RECOVERY FOR KNOWING BENEFICIARIES OF FORCED LABOR (18 U.S.C. § 1595)**

*(Against All Defendants)*

**133.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**134.** 18 U.S.C. § 1595 provides a civil cause of action against any person or entity that knowingly benefits, financially or by receiving anything of value, from participation in a venture it knew or should have known was engaged in forced labor in violation of 18 U.S.C. § 1589. The standards set forth in Count IV — including that participation in a venture does not require participation in the forced labor itself, that receipt of revenue from the venture satisfies the benefit element, that reckless disregard of red flags satisfies constructive knowledge, and that the knowledge of agents is imputed to their principals apply equally to this Count. So too do the continuing-venture, remedial-application, and post-2008 continuation allegations set forth in Count IV, which apply with equal force to the forced labor venture. Each Defendant benefited from the forced labor venture as follows: Defendants Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Paul Geer, Diane Geer, Michael Losicco, and Roxy Losicco received the direct value of Plaintiff's uncompensated labor and the tuition revenue of an enterprise whose operating costs that labor eliminated; Garnet Health received patient referral revenue from an enterprise whose operations were sustained in part by the uncompensated forced labor of minor students; Defendant Nancy Edwards and Defendant Quest Family Services Inc. received direct payments and, upon information and belief, referral fees, enrollment revenue from reciprocal student referrals, and financial benefit from delivering Plaintiff, whom Quest itself dispatched from Utah on a flight to Buffalo, New York with advance knowledge of her

destination at FFS in Hancock, New York to an institution they knew or should have known was extracting forced labor from enrolled minors; Defendants Brain, Fras, and Runge received financial compensation that lent professional legitimacy to an enterprise whose financial model depended on forced labor to construct and maintain the Argiros family estate; NATSAP received membership dues and lent institutional legitimacy to an enterprise whose operations were publicly documented as including the coerced labor of minor students; Defendant NBT Bank, N.A. and NBT Bancorp Inc. received account fees, processing fees, and float income on deposits representing in part the financial proceeds of an enterprise sustained by forced minor labor, and as the sole bank in the Village of Hancock with direct visibility into both the enterprise's tuition revenue and the Argiros family's personal accounts knew or should have known that the financial accumulation in those accounts was inconsistent with the operational costs of a legitimate therapeutic institution and consistent instead with an enterprise whose labor costs were eliminated by the coerced, uncompensated labor of the children in its custody; Defendant Villa Veritas Foundation Inc. and Defendant Suzanne Cusack received financial compensation from Plaintiff as a direct result of conditions caused by an enterprise whose coercive apparatus included forced labor, and treated Plaintiff without investigating or reporting the institutional source of those conditions; Defendant Lackawanna College received financial compensation from FFS while its on-campus instructors observed and failed to report the conditions of coerced labor to which enrolled students were subjected; the Delaware County Board of Supervisors received financial and political benefit from the Argiros family's economic entrenchment in county institutions while permitting FFS to operate without the licensure that would have subjected its labor practices to regulatory scrutiny; Kasos Co Family LP, Kasos Enterprises LLC, and Chapel Hill Land Holdings LLC hold real property and assets that were constructed,

maintained, and generated in whole or in part through the forced, uncompensated labor of minor students; and K9-5 Inc., whose corporate address remains the FFS campus grounds, was capitalized with and created out of the proceeds of the enterprise and held and deployed the dogs used to track and forcibly return students who attempted to flee the forced labor to which they were subjected, both benefiting financially from the enterprise that funded its creation and supplying the coercive infrastructure that prevented escape from it; The Hancock Herald, the only local newspaper serving the Village of Hancock and owned and published by Defendant Cindy Argiros under the name "Cindy Ray," received advertising revenue from Argiros-affiliated businesses and published favorable coverage of FFS and photographs advertising its grounds which were kept, maintained, and manicured through forced labor in order to extract further payment from future students, while suppressing any reporting of its abuse and unlawful conditions, thereby profiting from and advancing the enterprise that its press control helped shield from public scrutiny. Each of these Defendants knew or should have known that the enterprise was engaged in the forced labor of minor students based on the publicly available record of FFS's unlicensed and abusive operation dating back to at least 1990. That record includes the August 1990 cease and desist order issued to FFS by the New York State Division of Alcoholism and Alcohol Abuse.

135. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs from all Defendants jointly and severally. All applicable statutes of limitations are tolled as set forth supra.

**COUNT VII — CIVIL RECOVERY FOR OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT (18 U.S.C. § 1595)**

*(Against NBT Bank, N.A. and NBT Bancorp Inc.)*

136.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

137.    At all relevant times, NBT Bank maintained accounts for Education Plus Corporation d/b/a Family Foundation School and for Emmanuel Argiros, Cindy Argiros, and Betty Argiros individually, and, upon information and belief, for additional entities affiliated with or controlled by the Argiros Defendants through which the financial proceeds of the enterprise were deposited, transferred, and disbursed, including entities whose account activity reflects the fraudulent transfer of enterprise assets alleged herein. At all relevant times, NBT Bank was the only bank in the entire small, remote town of Hancock.

138.    18 U.S.C. § 1595 provides a civil cause of action against any person or entity that knowingly obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of 18 U.S.C. § 1591. NBT Bank obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591 by maintaining the FFS account relationship and continuing to process the enterprise's financial transactions without filing a Suspicious Activity Report and without terminating that relationship, notwithstanding the following facts, each of which NBT Bank knew or should have known and had every reason to know. Upon information and belief, FFS's own account-opening documents identified its stated purpose as the operation of a therapeutic boarding school for minors, while the public record available to NBT Bank throughout the same period  including the 1990 cease and desist order issued by the New York State Division of Alcoholism and Alcohol Abuse confirming that FFS provided substance abuse treatment to minors without any license, and Delaware County Sheriff's Office records

84

documenting repeated reports of abuse and unlawful conditions at FFS involving minor students, directly contradicted that stated purpose. The substantial tuition revenue deposited into FFS's NBT Bank accounts was not being expended on the food, staffing, or operational costs ordinarily associated with a residential institution for minors, because the minor students enrolled at FFS were themselves providing that labor without compensation — an anomaly discernible from NBT Bank's own account records. The accumulation of enterprise revenue in accounts held by Emmanuel Argiros, Cindy Argiros, and Betty Argiros personally was inconsistent with the legitimate operation of a licensed therapeutic institution and consistent instead with the personal financial enrichment of the enterprise's operators through the forced labor and sex trafficking of the children in their custody. Defendant Paul Geer remained on FFS's payroll, paid through NBT Bank, throughout the period during which FFS administration possessed actual knowledge of his conduct toward minor students. As the sole banking institution in the small, remote Village of Hancock throughout the relevant period, NBT Bank functioned as the exclusive financial infrastructure of the enterprise: every payroll disbursement to FFS employees, every tuition deposit from the families of enrolled minors, and every transfer among the Argiros Defendants necessarily flowed through NBT Bank, giving the bank comprehensive and unavoidable visibility into the totality of the enterprise's financial activity. NBT Bank's own branch personnel exhibited individualized suspicion toward FFS-connected financial activity: at least one FFS employee who regularly cashed FFS-issued paychecks at the Hancock branch was subjected, on a recurring basis, to treatment materially different from that accorded ordinary customers or than he experienced at his other banks, including prolonged verification times, demands for additional identification beyond what was customarily required, and visible scrutiny and questioning by bank personnel — conduct demonstrating that NBT Bank's own employees

harbored specific suspicion regarding FFS-connected deposits. In 2014, FFS ceased operations and closed amid publicized abuse allegations and civil litigation, and the wind-down of the enterprise including, upon information and belief, the below-market transfer of the FFS campus among Argiros-controlled entities was processed through accounts at NBT Bank; the collapse of the bank's decades-long institutional client under those circumstances was an unmistakable escalation of the red flags already before the bank, and NBT Bank responded with nothing — no inquiry, no Suspicious Activity Report, no termination of any account relationship, no report to law enforcement authorities. And the 2024-2025 federal criminal prosecution of Defendant Paul Geer for sex trafficking committed at FFS gave NBT Bank *actual notice* of the criminal conduct for which the enterprise was being prosecuted, after which NBT Bank continued to maintain the account relationship and process transactions on behalf of FFS and the Argiros entities without interruption. The progression is itself the obstruction: constructive notice from the public record beginning no later than the August 1990 cease and desist order to which the bank responded with nothing and continued to harbor the funds; escalated notice upon the enterprise's 2014 closure amid publicized abuse allegations, to which the bank responded with nothing and continue to harbor the funds; and actual notice upon the 2024–2025 federal prosecution and the February 2025 conviction that judicially substantiated the sex trafficking committed through the enterprise whose accounts the bank had held throughout, to which the bank again responded with nothing. At each stage, NBT Bank's obligations of customer due diligence and suspicious-activity reporting required inquiry; at each stage, the bank chose the continued receipt of fees over compliance.

139.    NBT Bank turned a blind eye to these repeated, detailed, and specific indicia of unlawful conduct: some arising from public records and criminal proceedings circulating within the same

small community in which NBT Bank operated as the only bank, others arising directly from NBT Bank's own account records, and others arising from the documented suspicion of NBT Bank's *own branch personnel*. By utterly failing to engage in any due diligence, by failing to file a Suspicious Activity Report, and by failing to terminate the account relationship, thereby enabling the sex trafficking and forced labor enterprise to continue operating by ensuring that the financial infrastructure through which its proceeds flowed remained undisturbed and unreported. Independent of any suspicious-activity reporting, NBT Bank took no account action of any kind — no termination, no restriction, no enhanced review, no inquiry of its client at any point across thirty-five years of escalating red flags; the obstruction alleged herein is established by that course of conduct and does not depend upon the existence or non-existence of any particular regulatory filing. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: NBT Bank's conduct sustained the concealment that delayed Plaintiff's discovery and assertion of her claims, deprived her of the financial-record evidence that timely inquiry, reporting, or account action would have generated or preserved, and facilitated the dissipation of the assets against which her recovery must be had. This Count is timely on its face: the obstruction conduct alleged herein continued through the 2024–2025 federal criminal proceedings.

140.    Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against NBT Bank, N.A. and NBT Bancorp Inc., jointly and severally.

## COUNT VIII — CIVIL RECOVERY FOR CHILD VICTIMS OF HUMAN TRAFFICKING

*(NY CLS Soc. Serv. § 483-bb)*

*(Against All Defendants)*

141.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

142.    NY CLS Soc. Serv. § 483-bb, as amended in 2021, provides a civil cause of action for child victims of human trafficking against any person or entity that knowingly advances or profits from such conduct, including those who benefit financially from the trafficking enterprise without directly committing predicate acts.

143.    Plaintiff's claims under § 483-bb are timely on each of several independent grounds, each pleaded in the alternative. The limitations period is suspended pursuant to § 483-bb(c), which authorizes suspension where the plaintiff's failure to file within the statutory period results from, inter alia, psychological trauma resulting from the trafficking or lack of knowledge that the conduct constituted trafficking: Plaintiff's psychological trauma and disability are documented in her ongoing need for psychiatric and psychological treatment which was prevented by Defendants' fraudulent representations and failure to treat the same during crucial points during adolescent development, continuing through the present, and Plaintiff lacked knowledge that she was the victim of a human trafficking enterprise until the FBI's 2024 contact and the evidence and testimony adduced at the February 2025 federal criminal trial of Defendant Paul Geer, at which the enterprise's structure, its financial trafficking scheme, its referral network, and the deliberate destruction of records were publicly established for the first time. Defendants are

further statutorily and equitably estopped from asserting the limitations period by their own concealment : the destruction of records; the suppression of abuse reports by law enforcement and medical providers; the isolation of students from outside contact; the suppression of Plaintiff's national identity and her isolation as a foreign minor; and the enterprise's retaliation against students who complained, including the retaliatory accusation and the "blackout" restriction imposed on Plaintiff when she sought gynecological care, for the defendants' own wrongful conduct caused the plaintiff to miss the limitations period itself. In the alternative, Plaintiff invokes the disability-based suspension available under § 483-bb(c), the tolling available under CPLR 212(e), and the fraudulent-concealment and equitable-tolling grounds set forth supra. Finally, § 483-bb, is invoked as a remedial enactment attaching a civil remedy to conduct that constituted sex trafficking and labor trafficking in fact when committed from 2000 through 2003, and its application here is pleaded in the alternative. Under each of these independent grounds, Plaintiff's claims are timely in their entirety.

144.    The Argiros Defendants directly advanced and profited from the trafficking by: receiving millions of dollars in tuition payments extracted through fraudulent misrepresentations to parents, courts, and referring school districts; receiving the direct financial benefit of free child labor used to construct and maintain their private estate; and operating the enterprise for over two decades while knowingly permitting the sexual exploitation of minor students in their custody.

145.    Each remaining Defendant knowingly advanced or profited from the trafficking as follows: the Village and Hancock PD received ongoing financial and political benefits from the Argiros family in exchange for institutional protection that enabled the enterprise to continue operating, and each act of report suppression constituted an affirmative act in furtherance of the

89

trafficking; the Delaware County Sheriff's Office and Delaware County Board of Supervisors received the political and financial benefits of the Argiros family's county-wide economic influence in exchange for institutional protection each provided to the enterprise; Garnet Health received recurring patient referral revenue from FFS and protected that revenue stream by suppressing reports of abuse that would have disrupted the enterprise's continued operation; Defendant Nancy Edwards solicited Plaintiff's family and procured Plaintiff's placement at Quest and FFS in exchange for a fee paid by Plaintiff's family and, upon information and belief, referral fees from both programs, and Defendant Quest Family Services Inc. and its principals operated the wilderness program that fed Plaintiff and other children into FFS, each without conducting any investigation into publicly available records of abuse dating back to at least 1990, including the August 1990 cease and desist order issued to FFS by the New York State Division of Alcoholism and Alcohol Abuse; Defendants Brain, Fras, and Runge received direct financial compensation from the enterprise in exchange for lending false professional legitimacy that was a material inducement to parents, courts, and referring institutions to place and retain students at FFS, directly enabling the enterprise to continue generating tuition revenue; Defendant Betty Argiros designed and operated the enterprise through which the trafficking occurred and received direct financial benefit from every aspect of its operation; Defendant Lynda Drake received compensation from the enterprise while failing to report trafficking-consistent conditions she directly observed as the school nurse; Defendant Diane Geer received compensation and personal benefit from the enterprise while actively enforcing its coercive apparatus and failing to fulfill her mandatory reporting obligations; Defendant Villa Veritas Foundation Inc. and Defendant Suzanne Cusack received financial benefit through Villa Veritas Foundation's participation in the enterprise's post-enrollment referral network and advanced the

enterprise's concealment by absorbing former FFS students into a treatment framework without investigating or reporting its institutional source; Defendant Lackawanna College received financial compensation from FFS while its on-campus instructors provided the academic legitimacy shield integral to FFS's fraudulent marketing; Defendant NATSAP received membership dues and advanced the enterprise's fraudulent therapeutic representations to referring families, agencies, and consultants; Kasos Co Family LP received and held the real property assets of the enterprise and transferred them at below-market value to insulate those assets from civil creditors; Kasos Enterprises LLC and related Kasos entities received and continue to hold real property and business assets generated through and sustained by the enterprise's operation, maintaining the Argiros family's financial entrenchment in Village institutions that enabled the trafficking to continue; Chapel Hill Land Holdings LLC received the transferred enterprise assets and took title with notice of the pending civil and criminal claims, enabling the concealment of evidence and the shielding of enterprise assets from Plaintiff and other victims; K9-5 Inc. received revenues generated through the forced labor of minor students and provided coercive infrastructure — dogs trained on the FFS campus — used to pursue and return runaway trafficking victims to the enterprise, The Hancock Herald, the only local newspaper serving the Village of Hancock and owned and published by Defendant Cindy Argiros under the name "Cindy Ray," received advertising revenue from Argiros-affiliated businesses and published favorable coverage of FFS including publishing photographs of its manicured grounds to solicit further tuition payments from future students while suppressing any reporting of its abuse and unlawful conditions, thereby profiting from and advancing the enterprise that its press control helped shield from public scrutiny.

146.    Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, and costs pursuant to § 483-bb. All applicable statutes of limitations are tolled as set forth supra.

## COUNT IX — CONSPIRACY TO BENEFIT FROM SEX TRAFFICKING AND FORCED LABOR (18 U.S.C. §§ 1595 AND 1594(c))

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Paul Geer, Diane Geer, Michael Losicco, Roxy Losicco, and Susan Runge, L.C.S.W.)*

147.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

148.    The Defendants named in this Count each possessed actual knowledge of the sex trafficking and forced labor venture operated through FFS and knowingly agreed to participate in and further its unlawful objectives: namely, to recruit minors into FFS through fraudulent misrepresentations, to subject enrolled students to forced labor and sexual exploitation, to suppress and conceal all reports of abuse, and to profit from the foregoing scheme. 18 U.S.C. § 1595, as amended, confers a civil cause of action against any person who "conspires to benefit," financially or by receiving anything of value, from participation in a venture that the person knew or should have known was engaged in sex trafficking or forced labor in violation of this chapter, and 18 U.S.C. § 1594(c) and (b) make conspiracy to violate § 1591 and § 1589 independent offenses giving rise to that civil liability. Unlike the knowing-beneficiary liability pleaded against other Defendants elsewhere in this Complaint, liability under this Count rests on each named Defendant's actual knowledge of the venture's unlawful objective and knowing agreement to further it. Proof that each such Defendant personally committed a substantive predicate act is not required; it is sufficient that each knowingly agreed to participate in and

92

advance the unlawful objectives of the venture. The conspiracy pleaded in this Count is separate and independent from the RICO conspiracy pleaded in Count II, and is actionable under the Trafficking Victims Protection Reauthorization Act regardless of the disposition of any other Count.

149.    In furtherance of this conspiracy, the named Defendants committed or directed overt acts described throughout this Complaint, including: the sexual assault and physical abuse of minor students; the transportation of minors across state lines and international borders under the cover of school trips; intimidation of victims through the work sanction system and direct threats of retaliation; the receipt and suppression of sexual abuse reports by Defendant Runge, who addressed each solely through staff termination and made no report to law enforcement or child protective authorities; Defendant Diane Geer's enforcement of the coercive work sanction apparatus while failing to report her knowledge of the abuse; the Losicco Defendants' direct daily control over Plaintiff within Family 2, including their administration of the coercive family structure through which work sanctions were ordered, and their representations to Plaintiff's mother that counseling would be withheld until Plaintiff cooperated with the program, made while concealing the conditions of her confinement; the deliberate shredding of student records and abuse complaints during active civil litigation; evasive sworn testimony designed to minimize prior acts of concealment; and the fraudulent transfer of FFS real property at below-market value between Argiros-controlled entities for the purpose of insulating enterprise assets from civil creditors. These overt acts were committed in concert with, and in furtherance of the shared unlawful objectives of, the conspiracy among the named Defendants.

150.    Plaintiff suffered harm as a direct and proximate result of this conspiracy and is entitled to compensatory and punitive damages from all co-conspirators jointly and severally.

151.    Civil conspiracy is timely under at least five independent theories: (1) fraudulent concealment tolling running through Plaintiff's discovery of the enterprise through the public Geer criminal proceedings; (2) the shredding of records as a within-limitations-period overt act restarting the clock; (3) Argiros's evasive trial testimony at Geer's criminal trial as an additional within-limitations-period overt act of concealment; (4) the fraudulent transfer of FFS real property to Chapel Hill Land Holdings LLC in November 2014 as a within-limitations-period overt act; and (5) the retention of student files and institutional records in a shed on the transferred property constituting a continuing overt act of concealment persisting through at least the date of the FBI's search.

## COUNT X — NEGLIGENT FAILURE TO PROVIDE PROMISED THERAPEUTIC SERVICES, FRAUDULENT AND NEGLIGENT MISREPRESENTATION, AND DECEPTIVE ACTS AND PRACTICES

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Ivan Fras, M.D., Jeff Brain, M.A., Susan Runge, L.C.S.W., and NATSAP)*

152.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

153.    These claims are pleaded simultaneously with, and without prejudice to, all other theories of liability set forth in this Complaint pursuant to Federal Rule of Civil Procedure 8(d). These claims arise independently from, and do not require proof of, any other theory of liability alleged in this Complaint. Defendants owed Plaintiff a distinct duty of reasonable care arising solely from their express representations that FFS would provide qualified psychiatric, psychological,

94

therapeutic, and substance abuse treatment services to enrolled students with identified mental health and behavioral needs. That duty was breached by Defendants' total failure to employ qualified professionals or deliver any of the promised services during a critical period of adolescent development. The resulting and continuing damages — including the loss of Plaintiff's education and an approximately twenty-year delay in her earning capacity, her severe and persistent psychiatric injury, her lasting eating disorder and body-image impairment, and her unmet need for psychiatric and psychological treatment dating back to at least 2008 — each have an independent causal pathway traceable entirely to that breach.

154.     Defendants breached their duty of reasonable care by: (a) failing to employ any qualified psychiatric, psychological, or licensed therapeutic professionals on a full-time basis capable of providing the clinical services represented to parents, courts, and referring institutions; (b) failing to conduct any meaningful psychiatric evaluation, diagnosis, or treatment planning for Plaintiff despite her identifiable mental health and behavioral needs; (c) failing to provide any evidence-based therapeutic intervention, counseling, or substance abuse treatment during Plaintiff's enrollment; (d) employing mandatory "food" group sessions for a Plaintiff who clearly presented to these professionals as severely underweight, that caused additional psychological harm rather than addressing Plaintiff's treatment needs and utilizing unrecognized methods in the medical or psychiatric fields such as forced feeding, laying in a grave, and watching others eat vomit, to treat a serious mental disorder such as disordered eating ; (e) failing to refer Plaintiff to qualified outside providers when FFS was unable to provide the promised services internally; and (f) permitting Defendants Fras, Brain, and Runge to lend their names and credentials to FFS's therapeutic representations while providing little to no actual clinical services to Plaintiff.

155.    Defendants Fras, Brain, and Runge each independently breached their professional duties to Plaintiff by failing to conduct any meaningful clinical assessment of Plaintiff's therapeutic needs, failing to provide or arrange for any evidence-based treatment intervention, and permitting their professional credentials to be used to support FFS's fraudulent therapeutic representations while collecting compensation from the enterprise, constituting negligence and malpractice.

156.    As a direct and proximate result of Defendants' negligent failure to provide promised therapeutic services — independently of any other theory of liability in this Complaint — Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages. The statute of limitations on this count is tolled by fraudulent concealment and the discovery rule as set forth supra.

157.    The allegations that follow, asserting fraudulent misrepresentation, negligent misrepresentation, and deceptive acts and practices, are asserted as part of this Count and are directed against Education Plus Corp., the Argiros Defendants, Ivan Fras, M.D., Jeff Brain, M.A., Susan Runge, L.C.S.W., and additionally against NATSAP.

158.    Through its publicly accessible website, printed marketing materials distributed to parents across the United States and Canada, direct written and oral communications to courts, school districts, and referring agencies, and its NATSAP founding membership designation which was used as a legitimacy imprimatur in those communications, FFS and the Argiros Defendants made the following material representations to the public and to Plaintiff's family: that FFS was a qualified therapeutic boarding school staffed by licensed psychiatric, psychological, and clinical social work professionals; that enrolled students would receive weekly individualized psychiatric care from a licensed psychiatrist; that enrolled students would

receive weekly individualized psychological counseling from a licensed psychologist; that enrolled students would receive clinical social work services from a licensed social worker; and that enrolled students would receive evidence-based drug and alcohol rehabilitation from qualified addiction counselors. NATSAP is independently liable under this Count for lending its membership designation to FFS's fraudulent marketing materials and permitting its name and organizational imprimatur to be used to represent that FFS met recognized therapeutic standards, representations that were false and that NATSAP knew or should have known were false.

159.    Each of these representations was false at the time it was made. FFS employed no qualified psychiatric, psychological, or licensed therapeutic professionals on a full-time basis. The individuals whose names and credentials were used to support these representations — Defendants Fras, Brain, and Runge provided little to no actual clinical services to enrolled students.

160.    These representations were consumer-oriented within the meaning of N.Y. General Business Law § 349 — they were directed at the public generally through FFS's website and marketing materials, made to hundreds of families across multiple states and countries over the course of decades, and were part of a systematic scheme to induce parents, courts, and school districts to purchase therapeutic services that FFS had no ability to provide.

161.    Plaintiff's family, acting in part on the representations of Defendant Nancy Edwards, justifiably relied on these representations in placing and retaining Plaintiff at FFS and in paying substantial tuition therefor.

162.    As a direct and proximate result of Defendants' fraudulent and negligent misrepresentations and deceptive acts and practices, Plaintiff was placed in an institution incapable of providing the services promised, was deprived of the diagnosis, treatment, and

therapeutic intervention she required during a critical period of her adolescence, and sustained the injuries described herein. Plaintiff is entitled to compensatory damages, punitive damages, treble damages and mandatory attorneys' fees pursuant to N.Y. General Business Law § 349(h), and such other relief as the Court deems just and proper. Plaintiff's fraudulent misrepresentation claims are independently timely under CPLR 213(8), which permits commencement of a fraud action within the greater of six years from the fraud or two years from the time the plaintiff discovered, or with reasonable diligence could have discovered, the fraud. Plaintiff discovered the fraud — the systematic misrepresentation of FFS's therapeutic capabilities, licensure, staffing, and true nature — through the public proceedings of Defendant Paul Geer's federal criminal trial in February 2025, could not with reasonable diligence have discovered it earlier for the reasons set forth supra, and commenced this action within two years of that discovery; the statutory discovery period of CPLR 213(8) applies of its own force and independently of any equitable tolling doctrine. All applicable statutes of limitations are tolled as set forth supra.

## COUNT XI — NEGLIGENCE AND NEGLIGENT SUPERVISION AND RETENTION

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Garnet Health Medical Center, the Village of Hancock, the Village of Hancock Police Department, and Delaware County Sheriff's Office)*

163.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

164.    Pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d), and without prejudice to the intentional conduct theories set forth in the preceding counts, the Argiros

Defendants and FFS owed Plaintiff and other enrolled minor students a non-delegable duty of reasonable care, including a duty to protect students from foreseeable harm caused by FFS staff.

165.   The conduct described in the factual allegations herein — including without limitation the retention of Defendant Geer despite actual knowledge of his predatory conduct and self-identified sex addiction; the failure to implement any system for reviewing, documenting, investigating, or reporting abuse complaints; the failure to supervise staff with unsupervised access to minor students; the permission granted to Geer to transport minor students across state lines and internationally; the deliberate design and implementation of the work sanction system by Defendant Betty Argiros as a mechanism of coercive control; the employment of Defendant Diane Geer who supervised and enforced work sanctions while possessing constructive knowledge of her husband's conduct; the employment of Defendant Lynda Drake as school nurse without implementing any reporting obligations or oversight; and the failure to investigate or take action upon abuse reports — constitutes a breach of the duty of reasonable care owed to Plaintiff that created an unreasonable and foreseeable risk of harm directly and proximately causing the injuries Plaintiff sustained.

166.   As a direct and proximate result of Defendants' negligence, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages. All applicable statutes of limitations are tolled as set forth supra.

## COUNT XII — CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983

*Fourteenth Amendment — Deliberate Indifference to Known Abuse*

*(Against the Village of Hancock, New York; the Village of Hancock Police Department;*

*Delaware County Sheriff's Office;* the County of Delaware, New York; and Delaware County

Board of Supervisors)

167.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

168.    At all relevant times, the Village, Hancock PD, the Delaware County Sheriff's Office, the

County of Delaware, and the Delaware County Board of Supervisors acted under color of state

law within the meaning of 42 U.S.C. § 1983.

169.    Plaintiff possessed a constitutionally protected liberty interest in personal security and

bodily integrity under the Fourteenth Amendment.

170.    Hancock PD officers received direct reports from multiple FFS students across multiple

years describing physical abuse and sexual abuse occurring at FFS. Rather than investigate or

intervene, officers suppressed complaints, threatened victims, directed students to remain silent,

and returned runaway students to FFS without inquiry into the conditions from which they fled.

171.    Delaware County Sheriff's Office personnel received direct reports of abuse, neglect, and

unlawful conditions at FFS from students, parents, and other sources, including reports

documented in Delaware County law enforcement records involving students as young as fifteen

years old. Rather than investigate or intervene, Sheriff's Office personnel suppressed complaints

and returned runaway students to FFS without inquiry. The Delaware County Board of

Supervisors' failure to exercise oversight authority over the Sheriff's Office's systematic

suppression of abuse reports, and its permission of FFS's unlicensed operation within the county

despite documentary knowledge of conditions, constitutes a policy or custom of deliberate indifference to known, ongoing child abuse for which the County is liable.

172.    This pattern of deliberate indifference to known, ongoing child abuse across multiple students and multiple years by both Hancock PD and the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors' failure to exercise oversight authority to correct it, constitute customs, policies, or practices of those entities for which each entity is liable. The customs, policies, and practices of the Delaware County Sheriff's Office and the Delaware County Board of Supervisors are the customs, policies, and practices of the County of Delaware, the Sheriff's Office and the Board are named as the arms of the County through which those customs, policies, and practices were carried out. The Argiros family's financial influence over Village and county institutions created an official policy of non-intervention that was well known to Village and county policymakers.

173.    As a direct and proximate result of Defendants' deliberate indifference, Plaintiff continued to suffer abuse that would have been halted had Defendants fulfilled their constitutional obligations. Plaintiff is entitled to compensatory damages, and attorneys' fees pursuant to 42 U.S.C. § 1988. All applicable statutes of limitations are tolled as set forth supra.

### COUNT XIII — NEGLIGENCE PER SE / FAILURE TO REPORT CHILD ABUSE

*(Against Garnet Health Medical Center, Lynda Drake, Diane Geer, Michael Losicco, Roxy Losicco, the Village of Hancock, the Village of Hancock Police Department, and Delaware County Sheriff's Office)*

174.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

175.    At all relevant times, New York law imposed mandatory reporting obligations on physicians, nurses, EMTs, hospital personnel, teachers, school officials and personnel, child care workers, and law enforcement officers who had reasonable cause to suspect that a child had been subjected to abuse or maltreatment, requiring them to report such suspicion to the appropriate state child protective authorities. These obligations existed and applied to Defendants during the period of Plaintiff's enrollment at FFS from 2000 through 2003.

176.    Garnet Health and its medical staff examined FFS students including Plaintiff presenting with injuries and conditions consistent with physical abuse, sexual abuse, and forced labor. Garnet Health personnel had reasonable cause to suspect abuse and failed to make any required report. Garnet Health additionally actively discouraged students from seeking further assistance, compounding its reporting failure with affirmative obstruction.

177.    Defendant Lynda Drake, serving as the school nurse and self-described licensed EMT at FFS, provided direct medical care to enrolled students including Plaintiff throughout Plaintiff's enrollment. In her capacity as a nurse and EMT providing professional medical services to minors, Defendant Drake was a mandatory reporter under New York Social Services Law § 413 and New York Public Health Law § 2803-d. Drake treated students presenting with conditions consistent with physical abuse, sexual abuse, and forced labor, giving her sustained direct knowledge of the physical and psychological condition of the minors in her care throughout the period of abuse. Drake had reasonable cause to suspect that children in her professional care had been subjected to abuse or maltreatment and failed to make any required report to child protective authorities.

178.    Defendant Diane Geer, serving as instructional and supervisory school personnel with direct responsibility for enrolled minor students including Plaintiff, was a mandatory reporter under New York Social Services Law § 413 during the period of Plaintiff's enrollment. In that capacity on the FFS campus, Defendant Diane Geer had direct professional contact with enrolled students and possessed actual or constructive knowledge of her husband's conduct toward minor students and of the conditions of coercion and abuse pervading the institution. Defendant Diane Geer had reasonable cause to suspect that children in her professional care had been subjected to abuse or maltreatment and failed to make any required report.

178-A. Defendants Michael Losicco and Roxy Losicco, serving as the family leaders of Family 2 with direct daily supervisory and custodial responsibility for Plaintiff throughout her enrollment, were school officials and child care personnel subject to the mandatory reporting obligations of New York Social Services Law § 413 during the period of Plaintiff's enrollment. Through their continuous supervision of and control over Plaintiff, including their administration of the family structure through which work sanctions and isolation were imposed — the Losicco Defendants possessed direct knowledge of the conditions of coercion, isolation, and abuse to which Plaintiff was subjected, had reasonable cause to suspect that Plaintiff and other children in their care had been subjected to abuse or maltreatment, and failed to make any required report to child protective authorities.

179.    Hancock PD officers received direct disclosures of child abuse from FFS students and were required as mandatory reporters and law enforcement officers to report such abuse and initiate investigation. Hancock PD systematically failed to fulfill these obligations across multiple reports from multiple students over multiple years.

180.   Delaware County Sheriff's Office personnel received direct disclosures of child abuse from FFS students and were required as mandatory reporters and law enforcement officers to report such abuse and initiate investigation. The Delaware County Sheriff's Office systematically failed to fulfill these obligations across multiple reports from multiple students over multiple years.

181.   The failure to report constitutes negligence per se, as Defendants violated a statute specifically designed to protect children such as Plaintiff from the continued abuse that predictably resulted from their silence. Plaintiff is entitled to compensatory and punitive damages.

182.   Garnet Health, Lynda Drake, Diane Geer, Michael Losicco, Roxy Losicco, Hancock PD, and the Delaware County Sheriff's Office's failure to report, in the context of the Argiros family's documented financial and political influence over Hancock County and Delaware County institutions, constitutes affirmative participation in the civil conspiracies described in Counts II and IX, for which these Defendants are jointly and severally liable.

183.   All applicable statutes of limitations are tolled as set forth supra.

## COUNT XIV — CIVIL REMEDY FOR PERSONAL INJURIES FROM CHILD SEX OFFENSES (18 U.S.C. § 2255)

*(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Nancy Edwards, Quest Family Services Inc., Karen Wells, Paul Geer, Diane Geer, Michael Losicco, and Roxy Losicco)*

104

184.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

185.    Plaintiff was a minor at the time of the conduct alleged herein. 18 U.S.C. § 2255 provides a civil remedy to any person who, while a minor, was a victim of a violation of, inter alia, 18 U.S.C. §§ 1589, 1591, 2421, 2422, or 2423, and who suffers personal injury as a result, and entitles such a person to recover actual damages or liquidated damages in the amount provided by § 2255(a), whichever is greater, together with punitive damages, reasonable attorneys' fees, and costs.

186.    As set forth in Counts III and V and in the predicate acts alleged in Count I, Defendants violated 18 U.S.C. §§ 2421 and 2423(a) — statutes in force at all times relevant hereto, including at the time of Plaintiff's October 2000 transport — by knowingly transporting Plaintiff, a minor, in interstate and foreign commerce, at the direction of Defendant Emmanuel Argiros and by means of Defendant Quest Family Services Inc.'s dispatch of Plaintiff from Utah, with intent that Plaintiff engage in sexual activity for which a person can be charged with a criminal offense; and violated 18 U.S.C. §§ 1589 and 1591 through the forced labor and commercial sexual exploitation of Plaintiff during her confinement from 2000 through 2003.

187.    Plaintiff suffered serious personal injury as a result of each such violation, as set forth herein.

188.    Plaintiff reasonably discovered the violations and the injuries forming the basis of this claim no earlier than February 2025, upon the revelations of the federal criminal trial of Defendant Paul Geer; this claim is timely under 18 U.S.C. § 2255(b), and all applicable limitations periods are further tolled as set forth supra.

## COUNT XV — LABOR TRAFFICKING (18 U.S.C. §§ 1590 AND 1595)

(Against Nancy Edwards, Quest Family Services Inc., Karen Wells, Education Plus Corp.,

Emmanuel Argiros, Betty Argiros, and Cindy Argiros)

189.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

190.    18 U.S.C. § 1590 imposes liability on whoever knowingly recruits, harbors, transports, provides, or obtains by any means any person for labor or services in violation of chapter 77 of Title 18, and 18 U.S.C. § 1595 provides Plaintiff a civil remedy for its violation. Section 1590 took effect on October 28, 2000 and was accordingly in force at the time of Plaintiff's October 30–31, 2000 transport from Canada through Buffalo, New York, and at all times thereafter through her June 2003 departure. Plaintiff's recruitment earlier in 2000 is pleaded as part of the same continuing course of conduct culminating in the post-enactment transport, harboring, and obtaining alleged herein.

191.    Each Defendant named in this Count personally committed one or more of the acts enumerated in § 1590, and did so for labor or services in violation of the chapter, namely, the forced labor to which Plaintiff was subjected at FFS in violation of 18 U.S.C. § 1589, as pleaded in Count V. Defendant Nancy Edwards recruited Plaintiff into the venture, soliciting Plaintiff's family in exchange for a fee and, upon information and belief, referral fees from both Quest and FFS, in reckless disregard of publicly available records documenting abuse and unlicensed operation at FFS, including the August 1990 cease and desist order issued by the New York State Division of Alcoholism and Alcohol Abuse. Defendant Quest Family Services Inc. harbored

106

Plaintiff, a minor, at its Utah facility for approximately seventy-eight days under coercive conditions and then transported, provided, and delivered her, dispatching her on the flight from Utah to Buffalo, New York with advance knowledge that her destination was the FFS campus in Hancock, New York, in exchange for referral fees and reciprocal enrollment revenue. Defendant Karen Wells, as Quest's owner, officer, and operator, personally directed and controlled each of those acts, and her knowledge is both her own and imputed to Quest. Defendant Emmanuel Argiros directed Plaintiff's transport into the venture. Defendants Education Plus Corp., Betty Argiros, and Cindy Argiros harbored, obtained, and maintained Plaintiff at FFS from February 2001 through June 2003 for the purpose of extracting the uncompensated labor described herein. Each Defendant acted knowingly or in reckless disregard of the fact that the institution into which Plaintiff was recruited, transported, and harbored extracted forced labor from the minor students in its custody.

192.    Section 1595 attaches a civil remedy to conduct that was criminal under § 1590 when committed against Plaintiff; its application here is remedial and is pleaded on the same basis as set forth in Counts III through VI. Plaintiff's claims under this Count are timely as set forth in ¶ 108-A and the Tolling section supra.

193.    As a direct and proximate result of the foregoing, Plaintiff suffered the injuries described herein and is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs, from the Defendants named in this Count jointly and severally.

107

## COUNT XVI — FRAUD

(Against Education Plus Corp., Emmanuel Argiros, Betty Argiros, Cindy Argiros, Ivan Fras, M.D., Jeff Brain, M.A., Susan Runge, L.C.S.W., and NATSAP)

194.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

195.    As set forth with particularity in this Complaint, Defendants made material representations of fact to Plaintiff's family and to the public through FFS's publicly accessible website, printed marketing materials, direct written and oral communications to parents, courts, school districts, and referring agencies, and the NATSAP membership designation used as a legitimacy imprimatur in those communications that FFS was a qualified therapeutic boarding school staffed by licensed psychiatric, psychological, and clinical social work professionals; that enrolled students would receive individualized psychiatric care from a licensed psychiatrist, individualized psychological counseling from a licensed psychologist, and clinical social work services from a licensed social worker; and that enrolled students would receive evidence-based drug and alcohol rehabilitation from qualified addiction counselors. Each of these representations was false when made, and each Defendant named in this Count knew it was false or made it with reckless disregard for its truth: FFS employed no qualified psychiatric, psychological, or licensed therapeutic professionals on a full-time basis; Defendants Fras, Brain, and Runge knew they provided little to no actual clinical services to enrolled students while permitting their names and credentials to be used to support the representations in exchange for compensation; the Argiros Defendants, as the founders and operators of the institution, knew the represented services did not exist; and NATSAP knew or recklessly disregarded that the therapeutic standards its membership designation implicitly certified were not met. Defendants made these

108

representations with the intent that parents, courts, and referring institutions rely upon them in placing and retaining students at FFS and in paying tuition.

196.    Plaintiff's family justifiably relied on these representations in placing and retaining Plaintiff at FFS and in paying substantial tuition therefor. Had Plaintiff's family known the truth, that FFS employed no qualified professionals, provided no treatment, and subjected the children in its custody to the regime described herein, Plaintiff would never have been placed or retained at FFS and no tuition would have been paid. Plaintiff, as the intended beneficiary of the services purchased and the direct victim of their absence, was injured by the fraud.

197.    This Count is timely under CPLR 213(8), which permits commencement of a fraud action two years from the time the plaintiff discovered the fraud. Plaintiff discovered the fraud through the public proceedings of Defendant Paul Geer's federal criminal trial in February 2025, could not with reasonable diligence have discovered it earlier for the reasons set forth supra, and commenced this action within two years of that discovery; the statutory discovery period of CPLR 213(8) applies of its own force and independently of any equitable tolling doctrine. All applicable limitations periods are further tolled as set forth supra.

198.    As a direct and proximate result of Defendants' fraud, Plaintiff sustained the injuries described herein, and is entitled to compensatory damages and, in light of the willful, wanton, and morally culpable character of Defendants' conduct, punitive damages, together with such other relief as the Court deems just and proper. This Count proceeds in addition and in the alternative to Count X pursuant to Federal Rule of Civil Procedure 8(d).

**WHEREFORE**, Plaintiff Jane Doe respectfully demands judgment against Defendants, jointly and severally, as follows:

A.      Compensatory damages in an amount to be determined at trial, but not less than $5 million

B.      Treble damages pursuant to 18 U.S.C. § 1964(c), in an amount not less than $15 million;

C.      Punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and egregious conduct and to deter similar conduct in the future;

D.      Attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c) and all other applicable statutes;

E.      Pre-judgment and post-judgment interest at the maximum rate permitted by law;

F.      Declaratory and injunctive relief as appropriate; and

G.      Any and all other relief this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,


**JOHANNESEN & UMANA, P.C.**

*Attorneys for Plaintiff*


By: _____


Elizabeth Sarah Johannesen, Esq.
68 Jay Street, Suite 225
Brooklyn, New York 11201
elizabethsarahjohannesen@esjlaw.info
P: (631) 559-1018



By: _____


Luis A. Umana, Esq.
68 Jay Street, Suite 225
Brooklyn, New York 11201
luisumana@esjlaw.info
P: (917) 757-2244